[S.F. No. 24869. Aug. 20, 1987.]

ROBERT L. BEERY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

804

COUNSEL

Robert L. Beery, in pro. per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Alan Cohen and Lawrence C. Yee for Respondent.

OPINION

THE COURT.—In this proceeding, we review the recommendation of the State Bar of California that petitioner Robert L. Beery be suspended from the practice of law for five years, that execution of suspension be stayed, and that petitioner be placed on probation for a period of five years on conditions which include actual suspension for a period of three years and until restitution in the amount of $35,000 has been made.

The recommendation is based on a single incident of misconduct: petitioner entered into a business transaction with a client under circumstances which violated rules 5-101 and 5-102 of the Rules of Professional Conduct and sections 6103 and 6106 of the Business and Professions Code.[1] Petitioner contends that the record does not support the finding of an attorney-client relationship at the time of the business transaction, that he did not willfully violate any rules of professional conduct or provisions of the Business and Professions Code, and that the recommended discipline is excessive.

Review of the record generated by the State Bar Court leads us to conclude that discipline is warranted and that the recommended discipline is appropriate, except that the period of actual suspension will be two years rather than three.

FACTS

Petitioner was admitted to the practice of law in the State of California in 1965. He has no prior disciplinary record.

The charge against petitioner stems from his representation of Richard Coss. In November 1974 petitioner incorporated American Steel Painting Corporation, which had been formed by Coss and an individual named

---

[1] A second incident formed the basis of other charges, designated count two of the notice to show cause, but findings on this count were favorable to petitioner and it was dismissed.

Miller, and which was engaged in painting steel bridges and other steel structures. In February 1975 petitioner represented the company in a dispute with the State of California regarding bidding procedures.

Coss was injured in an automobile collision in June 1975, as a result of which he was paralyzed from the waist down and confined to a wheelchair. Coss retained defendant and two of defendant's law associates, Maurice Nelson and Daniel Gardner, to represent him on a contingency fee basis in litigation against parties who might be liable for his injuries. Petitioner assisted in the initial investigation of the accident scene, but the bulk of the litigation and negotiation work was performed by Nelson and Gardner. Petitioner monitored the progress of the litigation and maintained communications with Coss.

The personal injury action was settled in two stages in 1979 and 1980 for a total of approximately $250,000, of which Coss received approximately $150,000. Petitioner's share of the contingent fee amounted to approximately $20,000. In December 1980 Coss asked the advice of Maurice Nelson, who had handled the disbursement of settlement proceeds, regarding investing the money which Coss was then receiving. Coss, who was not sophisticated in financial matters, wanted a high rate of return but also was concerned about safeguarding principal. Nelson recommended United States Treasury securities, which were then yielding a high rate of interest.

In late December of 1980, Coss telephoned petitioner and asked for petitioner's advice regarding investments, saying he wanted a "fixed income." Coss considered petitioner both his attorney and his friend and had a high regard for petitioner's business acumen. Petitioner mentioned money markets, cash management accounts, and bonds. During the following weeks Coss placed two more telephone calls to petitioner to discuss investments and also, at the urging of Coss's wife, to discuss the possible drafting of a will. A meeting was arranged for February 25, 1981, in petitioner's law office in San Francisco. During one of the telephone conversations, in response to a casual inquiry about what he had been doing, petitioner said he was involved in a very interesting and exciting business venture using satellite technology.

During the meeting on February 25, petitioner told Coss that Coss could "buy into" the satellite venture and that it was a "good investment." Petitioner said Coss could invest $35,000.[2] Petitioner offered to personally guar-

---

[2] Coss testified that petitioner said there was $75,000 "available to invest" and that he (petitioner) would be investing $40,000. The hearing panel made no finding on whether petitioner represented he was personally investing $40,000. There was no evidence that petitioner made a loan to or invested in the satellite venture at that time.

antee Coss's investment. Coss said he would talk to his wife about it. Petitioner also discussed preparation of a will for Coss. Petitioner explained three different ways a will could be structured. Coss said he wanted everything to go to his wife if she survived him or, if not, to his two children in equal shares. Coss provided petitioner with the birth dates of his children but did not specifically direct petitioner to prepare a will.

The business venture which petitioner recommended to Coss was C & D Satellite Systems, Inc. (Satellite), which petitioner had incorporated the previous year. The principals of the corporation were petitioner, Thomas Benoit, and Leonard Sheffman. Benoit was the president and worked in sales and marketing, as did Sheffman. Petitioner handled legal matters and procured financing. A fourth individual, Donald May, was in charge of engineering. The business of Satellite was to install and operate computer-controlled, satellite-based entertainment and security functions for hotels and other commercial establishments. The principals had invested approximately $5,000 in Satellite, most of which had been consumed by administrative expenses. Petitioner's law office was used as Satellite's business address.

In September 1980 Satellite had entered into a contract to install a system in the Sands Hotel in San Diego. This was the first and only such contract which Satellite obtained. Sands was obligated to pay a fixed amount per room per month for a period of 10 years, with an option to renew for an additional 10 years, but payment was required only upon proof that all elements of the system were operating properly. The projected revenue to Satellite was $9,000 per month. To purchase the equipment for the project, Satellite borrowed $250,000 from Commercial Western Finance Corporation (Commercial). The loan was secured by Benoit's residence and by shares owned by petitioner in a ranching venture.

Satellite installed the equipment in the Sands Hotel in December 1980 but it did not function properly. Donald May informed Benoit that $30,000 to $35,000 would be needed to purchase additional equipment to make the system work as promised. Benoit passed this information along to petitioner, who knew that Commercial would not advance the money, nor would any other professional lender.

After the meeting with petitioner on February 25, Coss explained to his wife what petitioner had told him about Satellite. A few days later petitioner telephoned and asked if he could meet Coss and his wife at their home in Rocklin on Sunday morning, March 1. Coss and his wife agreed.

Petitioner arrived with a document dated February 26, 1981, and signed by Thomas Benoit for Satellite. The document provided that Satellite would

pay to Coss the sum of $35,000, in equal monthly installments of principal and interest at the rate of 22 percent per annum, commencing on February 26, 1981, and payable on the 26th day of each month. The note did not specify the amount of the monthly payments, the rate of amortization, or the total number of payments. The note provided that the whole amount would become due on default and that the interest rate would then "be automatically adjusted to the maximum rate allowable by California law." The same document provided for an assignment by Satellite to Coss of the sum of $35,000 plus interest as specified in the note "of the money due or to become due under the contract dated September 8, 1980, from the Sands Hotel . . . with full power and authority to collect said sum as it becomes due."

When Coss reminded petitioner of his promise to guarantee repayment, petitioner wrote across the bottom of the document: "This note shall be paid in full within one year from the date hereof, and is personally guaranteed by the undersigned Robert L. Beery." Coss then accepted the document and wrote a check to Satellite in the amount of $35,000 which he gave to petitioner.

Petitioner did not explain his own relationship with Satellite except to say that he was "helping it get set up" and "hustling on the deal." Coss believed that petitioner was acting as his attorney in recommending the loan to Satellite and would not have entered into the transaction had he believed otherwise. Petitioner did not advise Coss that Coss could or should discuss the transaction with another lawyer or with an investment counselor. Petitioner did not tell Coss what Satellite planned to do with the money or that Satellite was having problems with the installation at the Sands Hotel. Petitioner did not mention that the money could not have been borrowed from a commercial lender.

Satellite's installation at the Sands Hotel never performed as promised and no money was ever paid to Satellite under the contract. A settlement was reached under which the Sands Hotel purchased some of the equipment from Satellite for $30,000. Satellite used the money to pay suppliers and paid nothing to Coss. Satellite defaulted on its loan from Commercial, which foreclosed on the security pledged by petitioner and Benoit. Coss, who had received nothing from Satellite or from the Sands Hotel, retained another attorney and brought suit against petitioner on his guarantee of the promissory note. Petitioner did not contest the action and a default judgment was entered against him. By this time petitioner had closed his office in San Francisco and was living in Nevada. Petitioner never paid any portion of the judgment. At the hearing he testified that he did not have the money to pay the judgment.

The hearing panel found that a lawyer-client relationship existed between petitioner and Coss at the time of the discussions of investment and the loan to Satellite, that the transaction was neither fair nor reasonable to Coss, that petitioner concealed material facts from Coss, that Coss was not given reasonable opportunity to seek the advice of independent counsel and did not consent in writing to the transaction, that petitioner represented conflicting interests without advising Coss of the existence of the conflict and without obtaining the written consent of any of the parties, and that a fiduciary relationship existed between petitioner and Coss at all times in issue. The panel concluded that petitioner had willfully violated rules 5-101 and 5-102(B) of the Rules of Professional Conduct and sections 6103 and 6106 of the Business and Professions Code and that petitioner's "conduct in the premises was dishonest."

The review department by motion adopted the decision of the hearing panel, noting that "in view of the degree of actual suspension recommended, it would be appropriate for the Supreme Court to include in its order in this matter a requirement that the Respondent comply with the provisions of Rule 955, California Rules of Court within the time directed by the Supreme Court." Three referees voted against the motion on the ground that the degree of discipline recommended appeared excessive.

## I

██ Findings of the hearing panel, adopted by the review department, are not binding on this court, and we will weigh the evidence and determine its sufficiency, but the findings will be given great weight, particularly as to credibility of witnesses who have given conflicting testimony. (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 11-12 [206 Cal.Rptr. 373, 686 P.2d 1177].)

In each instance where the hearing panel resolved a conflict in the testimony of petitioner and Coss, it did so by crediting the testimony of Coss rather than petitioner. For example, Coss testified he called petitioner on several occasions to solicit petitioner's advice regarding investment of the litigation proceeds. Petitioner, on the other hand, testified that Coss did not ask his advice and that it was petitioner who contacted Coss to ask if Coss would be interested in making a loan to Satellite. The hearing panel found that Coss sought and arranged to obtain petitioner's advice and counsel for investment of the funds. Also, petitioner denied Coss's testimony that the two of them discussed the preparation or terms of a will for Coss. The hearing panel found that preparation of a will was discussed.

██ Petitioner urges us to adopt his version of events and to reject the findings of the hearing panel. He maintains that his testimony is more

plausible than Coss's because if a will had been discussed he would have billed Coss for his advice and would have followed through with preparation of a will. He maintains that Coss relied on Maurice Nelson for investment advice and did not want or need petitioner's advice. He also maintains that the record, taken as a whole, "reflects a collusive effort by Mr. and Mrs. Coss, aided by witness Maurice J. Nelson, to invade the client's Security Fund, through fraud and perjury."[3]

Petitioner's contention is lacking in merit. Having carefully reviewed the entire record, we find no indication of perjury or attempted fraud on the part of Coss. The failure to bill Coss for the will discussion does not establish that it never took place. Having just collected a large contingency fee for representing Coss, petitioner may have intended to perform the additional service without charge. Also, Coss testified that he intended to discuss the matter with his wife before directing petitioner to prepare a will and then simply put off making a decision on the subject. Petitioner may have postponed billing until a will was actually prepared, or he may have been reluctant to bill in view of his use of the same meeting to solicit funds from Coss. The question of whether Coss solicited petitioner's advice is a straightforward conflict in testimony. The hearing panel, having observed the witnesses as they testified, was in the best position to judge credibility and petitioner has failed to demonstrate error in the findings unanimously adopted by the panel.

On another factual issue, the testimony of an apparently unbiased witness supported Coss rather than petitioner. Petitioner testified that he and Thomas Benoit met with Coss at a restaurant in San Rafael before Coss made the loan to Satellite. Coss testified that the meeting occurred after the loan transaction. Benoit's testimony corroborated Coss, not petitioner. Considering the record as a whole and giving great weight to the findings of the hearing panel, we agree with the implied determination of the hearing panel that Coss was a more credible witness than petitioner.

The evidence amply supports the existence of an attorney-client relationship at the time of the loan transaction. "The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result." (*Westinghouse Elec. Corp.* v. *Kerr-McGee Corp.* (7th Cir. 1978) 580 F.2d 1311, 1319, fn. omitted.) "When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*." (*Per-*

---

[3] Coss's client security fund application was consolidated with the disciplinary matter and he was found by the hearing panel to have suffered a reimbursable loss.

*kins* v. *West Coast Lumber Co.* (1900) 129 Cal. 427, 429 [62 P. 57].) "The absence of an agreement with respect to the fee to be charged does not prevent the relationship from arising." (*Miller* v. *Metzinger* (1979) 91 Cal.App.3d 31, 39 [154 Cal.Rptr. 22].) ▮ Coss sought and obtained petitioner's legal advice regarding preparation of a will at the same time that petitioner induced Coss to enter into the business transaction, and so an attorney-client relationship existed at that time.

Even apart from the will consultation, it would appear that the attorney-client relationship which existed during prosecution of the personal injury suit had not effectively terminated in relation to this business transaction. Given that petitioner had acted as attorney for Coss's business even before the personal injury litigation, that the same fund of money was involved in both the personal injury litigation and the business transaction, that Coss began soliciting petitioner's investment advice even before the final distribution of the litigation proceeds, and that nothing ever occurred which would signal to Coss an end of the attorney-client relationship, petitioner owed Coss the duties which attend the relationship of attorney and client.

## II

▮ Next petitioner contends that the loan to Satellite was "purely a business matter" and that he did not willfully violate any rules of professional conduct.

▮ "All business dealings between an attorney and client in which the attorney benefits are closely scrutinized for unfairness on the attorney's part [citations] and attorneys have been disciplined for inducing clients to invest in enterprises without fully apprising them of the risks. [Citations.]" (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 445, fn. 4 [113 Cal.Rptr. 602, 521 P.2d 858].)

"While an attorney is not prohibited from having business transactions with his client, yet, inasmuch as the relation of attorney and client is one wherein the attorney is apt to have very great influence over the client, especially in transactions which are a part of or intimately connected with the very business in reference to which the relation exists, such transactions are always scrutinized by courts with jealous care, and are set aside at the mere instance of the client, unless the attorney can show by extrinsic evidence that his client acted with full knowledge of all the facts connected with such transaction, and fully understood their effect; and in any attempt by the attorney to enforce an agreement on the part of the client growing out of such transaction, the burden of proof is always upon the attorney to show that the dealing was fair and just, and that the client was fully advised.

[Citations.] In the words of Lord Eldon, he must make it manifest that he gave to his client 'all that reasonable advice against himself that he would have given him against a third person.' (*Gibson* v. *Jeyes,* 6 Ves. 278.)" (*Felton* v. *Le Breton* (1891) 92 Cal. 457, 469 [28 P. 490]. See also *Estate of Witt* (1926) 198 Cal. 407, 419 [245 P. 197]; *Gold* v. *Greenwald* (1966) 247 Cal.App.2d 296, 305-306 [55 Cal.Rptr. 660].)

■ The attorney-client relationship is a fiduciary relation of the very highest character imposing on the attorney a duty to communicate to the client whatever information the attorney has or may acquire in relation to the subject matter of the transaction. (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 189-190 [98 Cal.Rptr. 837, 491 P.2d 421]; *Clancy* v. *State Bar* (1969) 71 Cal.2d 140, 146-148 [77 Cal.Rptr. 657, 454 P.2d 329].) "The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." (*Barbara A.* v. *John G.* (1983) 145 Cal.App.3d 369, 383 [193 Cal.Rptr. 422].) An attorney's violation of the duty arising in a fiduciary or confidential relationship warrants discipline even in the absence of an attorney-client relationship. (*Worth* v. *State Bar* (1976) 17 Cal.3d 337, 341 [130 Cal.Rptr. 712, 551 P.2d 16]; *Sodikoff* v. *State Bar* (1975) 14 Cal.3d 422, 429 [121 Cal.Rptr. 467, 535 P.2d 331]; *Lewis* v. *State Bar* (1973) 9 Cal.3d 704, 713 [108 Cal.Rptr. 821, 511 P.2d 1173].)

In *Sodikoff* v. *State Bar, supra,* 14 Cal.3d 422, an attorney representing the administrator of a decedent's estate attempted to purchase real property from a beneficiary without disclosing that the buyer was the attorney's corporate alter ego and that the property had been appraised for substantially more than the attorney proposed to pay. As here, the attorney argued there was no attorney-client relationship and the transaction was merely an arm's-length business deal. This contention was rejected: "[P]etitioner misconceives the thrust of these proceedings. This is not a prosecution for the crime of obtaining property by false pretenses, or even a civil action for fraud. It is an inquiry into whether petitioner has lived up to the high ethical standards of his profession. [Citation.] The record shows that he fell far short of those ideals when he knowingly tried to take advantage of a relationship of personal trust and confidence by falsely representing that his corporate *alter ego* was a client of his law firm and by attempting to buy through that device the property of Mr. Wehrley for substantially less than its true value." (Pp. 430-431.)

In *Worth* v. *State Bar, supra,* 17 Cal.3d 337, an attorney obtained $25,000 from the 77-year-old mother of his law partner by representing that she

would be a limited partner in a real estate venture. The attorney failed to explain that he owned only one of the three parcels needed for the venture and thereafter he failed to complete a certificate of limited partnership. Discipline was imposed because "[a]n attorney who accepts the responsibility of a fiduciary nature is held to the high standards of the legal profession whether or not he acts in his capacity of an attorney." (P. 341.)

In *Clancy v. State Bar, supra,* 71 Cal.2d 140, an attorney obtained $1,000 from a woman he had represented in connection with a personal injury claim, the probate of her deceased husband's estate, and application for a widow's pension from the Veteran's Administration. According to the woman's testimony, the attorney had represented that the money would be invested in G.I. mortgages. The attorney denied making the representation but resolution of this conflict was found to be unnecessary: "We do not agree with petitioner that 'the one crucial and determinative fact to be resolved' in this proceeding is what petitioner said to Mrs. Ragsdale. Rather, in our view, the fact that determines his culpability is what he left unsaid, i.e., his failure to disclose that he needed funds for his own use because of his pressing financial obligations and his inability to obtain funds elsewhere." (P. 147.) "The finding of both the trial committee and the disciplinary board was that petitioner communicated with Mrs. Ragsdale by telephone for the purpose of obtaining funds from her for his personal use and, although aware of her concern for the safety of her money, he failed to disclose to her the nature of his then existing financial difficulties; he failed to disclose that he desired the funds for his personal use; and he failed to disclose that he was unable to procure funds for this purpose from any other source." (P. 148.) "Petitioner admittedly initiated the transaction, and whether he subjectively regarded it as a loan to him or an investment in him, he failed to fully and fairly disclose that the ultimate object of the investment was a temporary solution to his financial problems. He has not sustained his burden of showing that the transaction was 'at arm's length' [citation], and the record amply supports the finding that he 'used his position as an attorney for Mrs. Ragsdale and his knowledge of her lack of understanding of financial matters and her trust and confidence in him to obtain money from her fraudulently for his personal use without full, fair and truthful disclosure of the purpose for which the funds were to be used, and of his then existing financial condition which, if it had been disclosed, would have thwarted his purpose in acquiring these funds.'" (P. 150.)

■ Petitioner's conduct was similar to that of the attorneys in the cases just cited. He solicited funds from Coss knowing that Coss placed great trust in him, that Coss was unsophisticated in financial matters, and that safety of the funds was a matter of the highest importance to Coss, a young man with a family to support who had recently suffered an injury

leaving him paralyzed from the waist down and unable to perform his previous occupation of painter. Petitioner did not fully disclose his relationship with Satellite, nor did he advise Coss that Satellite had almost no invested capital, that the equipment installed at the Sands Hotel was not working properly, or that funds were unobtainable from commercial lenders. Petitioner did not suggest that Coss seek independent advice regarding the transaction. Petitioner guaranteed Satellite's note but only after Coss reminded him of his oral promise to do so. Petitioner failed to disclose that he would have no funds to make good on the guarantee if the Sands Hotel project failed. In short, this was not an arm's length business deal, material facts were concealed, and there is ample precedent for imposing discipline.

■ An attorney may be disciplined by disbarment or suspension for a willful violation of the Rules of Professional Conduct. (Bus. & Prof. Code, § 6077; *Palomo* v. *State Bar* (1984) 36 Cal.3d 785, 795 [205 Cal.Rptr. 834, 685 P.2d 1185].) Knowledge of the provision violated need not be shown nor is ignorance a defense: willful breach is established by evidence showing the attorney acted or omitted to act purposely. (*Hamilton* v. *State Bar* (1979) 23 Cal.3d 868, 873-874 [153 Cal.Rptr. 602, 591 P.2d 1254]; *Millsberg* v. *State Bar* (1971) 6 Cal.3d 65, 74-75 [98 Cal.Rptr. 223, 490 P.2d 543].)

■ Petitioner characterizes his own conduct as a negligent failure to comply with a purely technical requirement that he disclose his status as a principal of Satellite and that he obtain Coss's consent to his acting in a dual capacity. In so doing petitioner ignores the substance of the wrong he committed, which was an abuse of the trust reposed in him by his failure to disclose fully and fairly the highly risky nature of the enterprise for which he was soliciting funds. The manner in which the transaction was presented to Coss was carefully designed to place it in the most favorable light and to disclose none of the information which could have discouraged Coss from accepting. Petitioner knew what he was doing and intended to commit the acts. (*Abeles* v. *State Bar* (1973) 9 Cal.3d 603, 611 [108 Cal.Rptr. 359, 510 P.2d 719].) Petitioner's conduct could not have been other than willful.

### III

■ Although the ultimate decision on discipline rests with this court, the review department's recommendation is entitled to great weight. (*Alberton* v. *State Bar, supra,* 37 Cal.3d at p. 14.) Appropriate discipline must be determined case by case. (*Ibid.*) "Our principal concern is always the protection of the public, the preservation of confidence in the legal profession, and the maintenance of the highest possible professional standard for attor-

neys." (*Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 514 [153 Cal.Rptr. 24, 591 P.2d 47].)

A point in petitioner's favor is the absence of prior discipline during a fairly lengthy legal career. The presence or absence of a prior disciplinary record is properly considered in determining penalty. (*Lewis* v. *State Bar, supra,* 9 Cal.3d at p. 715.)

Petitioner's failure to demonstrate appreciation for the seriousness of his misconduct must be entered on the other side of the ledger. Increased discipline is warranted by an attorney's "apparent lack of insight into the wrongfulness of his actions." (*Sodikoff* v. *State Bar, supra,* 14 Cal.3d at p. 432.) Petitioner is within his rights in disputing the factual findings of the State Bar Court and his failure to acquiesce in the findings does not of itself constitute a lack of insight. But petitioner has made it plain that he views as trivial the misconduct disclosed by Coss's testimony and the State Bar findings, and this attitude is a matter of legitimate concern.

The recommended discipline of three years actual suspension appears to be greater than has been imposed under similar circumstances in the past. In part II of this opinion, petitioner's conduct was found to have been similar to that of the attorneys in *Sodikoff, supra,* 14 Cal.3d 422, *Worth, supra,* 17 Cal.3d 337, and *Clancy, supra,* 71 Cal.2d 140. The period of actual suspension was one year in *Worth* and six months in *Sodikoff* and in *Clancy.* While past disciplinary practices are not binding, they are entitled to consideration. Also, as previously mentioned, three of the referees in the review department voted against the hearing department recommendation on the ground of excessive discipline.

Viewing the record as a whole, we conclude that actual suspension for a period of two years is appropriate. A requirement of restitution in the amount of $35,000 is also appropriate but, recognizing the financial hardship which suspension is likely to cause, completion of restitution will not be required during the period of actual suspension. It will be sufficient that restitution is made a condition of probation.

The record indicates that Coss's application to the State Bar Client Security Fund (Fund) was granted by the hearing panel, but it does not reflect the final disposition of the matter. To the extent the Fund has reimbursed Coss, petitioner will make restitution to the Fund, and to the extent Coss has received less than $35,000 from the Fund, petitioner will make restitution to Coss. Restitution will be made pursuant to a payment program approved by the State Bar Court.

With these exceptions, we adopt the provisions of discipline recommended by the State Bar Court. Also, as suggested by the review department, compliance with rule 955 of the California Rules of Court will be ordered.

Accordingly, it is ordered that petitioner be suspended from the practice of law for five years, that execution of the suspension be stayed, and that petitioner be placed on probation for five years on the following conditions: (1) actual suspension from the practice of law for the first two years of the period of probation; (2) payment of restitution according to a payment program approved by the State Bar Court; and (3) compliance with conditions 3, 4, 5, 7, 8 and 9 of the hearing panel decision in this matter filed on September 4, 1984, and adopted by the review department on November 15, 1984. Petitioner is ordered to take and pass the Professional Responsibility Examination prior to the end of the period of actual suspension. Petitioner is further ordered to comply with rule 955 of the California Rules of Court, and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.