[No. S006167. Mar. 16, 1989.]

BOBBY D. RODGERS, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Jon P. Beaver for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Richard J. Zanassi and Sherrie McLetchie for Respondent.

OPINION

THE COURT.*—We review the recommendation of the Review Department of the State Bar Court (hereafter the department) that petitioner Bobby D. Rodgers (hereafter Rodgers) be disbarred from the practice of law in California. After considering the record we conclude that we should adopt the department's findings of fact and conclusions of law, but that we should order, in place of disbarment, five years' suspension, stayed on condition of probation with two years' actual suspension.

In September 1981 attorney George Brekke filed a complaint against Rodgers with the State Bar. The complaint arose out of Rodgers's representation of Thann Penery, the conservator of the person and estate of Thelma Wright Raymond, who was one of Brekke's clients. Brekke alleged that Rodgers, as Penery's attorney, mishandled the estate's funds and wilfully concealed his wrongful acts.

Rodgers met and corresponded with the State Bar a number of times in 1982. The State Bar then suspended its investigation. It apparently did so pending resolution of a civil action brought by Raymond against Rodgers, Penery, and one Thurl Panky, alleging negligence, fraud, conversion, malpractice, and conspiracy arising out of the conservatorship.

---

*Before, Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Eagleson, J., Kaufman, J., and Racanelli (John T.), J.†

---

†Associate Justice, Court of Appeal, First Appellate District, Division One, assigned by the Chairperson of the Judicial Council.

In May 1986 the State Bar issued a notice to show cause. In September 1986 the parties met for a mandatory settlement conference. They failed, however, to reach any stipulation as to facts and discipline. The matter was set for formal hearing. In April 1987 the hearing was held before a hearing panel consisting of a single referee. The referee found the following facts.

Rodgers was admitted to the practice of law in California in January 1969 and has no prior record of discipline. In June 1979 Penery, who had previously been represented by Rodgers, consulted him about establishing a conservatorship over the person and estate of Raymond, who was her 80-year-old aunt. Although Rodgers had no experience in conservatorship proceedings, he nonetheless agreed to represent Penery in the matter. Despite his inexperience, Rodgers failed to perform necessary legal research on the law of conservatorships. Later that month, he submitted a petition for appointment of Penery as conservator. At this time Penery was in control of Raymond's funds and asked Rodgers if he could give her investment advice. Rodgers suggested that Penery consider lending money to Panky. Panky was one of Rodgers's clients and also one of his former business partners. Rodgers failed to disclose either of these facts.

In July 1979 Penery transferred $26,000 of Raymond's funds to Rodgers for investment with Panky. There was no evidence that a loan agreement was reduced to writing, that the loan was secured by Panky's assets, or that the agreement provided for a definite rate of interest.[1] Rodgers did not obtain permission from the probate court for Penery to lend Raymond's funds to Panky as required by Probate Code section 2570, nor did he inform the court of the loan.

In August 1979 Penery was appointed conservator over Raymond's person and estate. Within 90 days of her appointment she was required to file an inventory and appraisal of Raymond's assets. She did not do so. Rodgers did not request a continuance or otherwise inform the court that the inventory would not be forthcoming.

In the spring of 1980 Raymond retained attorney Brekke to represent her in an action to terminate the conservatorship. Brekke attempted to determine the extent of Raymond's assets but had difficulty because the required inventory had not been submitted. Brekke contacted Rodgers, informed him that Raymond would seek to terminate the conservatorship, and asked him to explain what Penery was doing with Raymond's funds. Rodgers told

---

[1] Rodgers claimed that his secretary prepared separate notes for a $20,000 and a $6,000 loan, that he reviewed the notes, and that the notes provided for interest at the rate of 10 percent a year. He failed, however, to present any documentary evidence in support. He conceded that the original loans were not secured.

Brekke about the loans to Panky and promised to deliver copies of the notes. Brekke also asked about Rodgers's relationship with Panky and expressed concern when Rodgers told him that the loans were not secured.

After his conversation with Brekke, Rodgers facilitated another $6,000 loan between Penery and Panky and drew up new promissory notes extending the two previous loans. Like those, this loan was not approved by the court. In July 1980 Rodgers delivered to Brekke three promissory notes for $22,000, $6,600 and $6,000 respectively, each of which was purportedly secured by Rodgers's own assets. The $22,000 note was secured by an assignment of Rodgers's interest in a $46,000 promissory note from one Lades; this note carried a monthly payment of $700, payable from August 10, 1980, until July 10, 1985, at an interest rate of 10 percent a year.[2] The loans for $6,600 and $6,000 were both secured by an assignment of Rodgers's interest in a $15,000 promissory note payable "at maturity" by one Mohanna.

After investigation Brekke discovered that these assignments were not notarized and consequently could not be recorded. He asked Rodgers to notarize the assignments but Rodgers did not immediately respond. Instead, in January 1981 Rodgers again assigned the Lades note, this time to secure a debt for his father. Rodgers did not inform Penery or Brekke of this subsequent assignment. This assignment was notarized, so that if it was recorded it would have been senior to Rodgers's assignment to Penery.

Rodgers deposited the new $6,000 loan Penery made to Panky in his client trust account. His bookkeeper accounted for the deposit by crediting Panky's account for $5,000 he allegedly owed for legal services. A few days later Rodgers drew a check on his client trust account for $5,000 to avoid foreclosure on his family's residence. At no time did he inform Penery that Panky would use the bulk of the loan to pay his legal fees.

In October 1980 the court terminated the conservatorship over Raymond's person. The court continued the conservatorship over her estate, however, because Penery had still not filed the required inventory of the estate's assets. It ordered Penery to submit the inventory.

In January 1981 the inventory was finally submitted. The loans to Panky were described only as a "loan" without any further explanation; their terms and conditions were not disclosed. Raymond objected to the inventory.

---

[2] Although the Lades note was assigned as security in August 1980, Rodgers did not forward the monthly payments to the conservatorship account or to his own client trust account.

In June 1981 the court held a hearing on the objection. It ordered the public guardian to serve as the temporary conservator of Raymond's estate. It also ordered Rodgers to pay the public guardian all the funds of the conservatorship, including the monthly payments he received on the Lades note from August 1980 until May 1981. Rodgers did not immediately comply. Consequently, the public guardian petitioned the court for further instructions. Thereafter Rodgers gave the public guardian a check for $6,300 representing the money received on the Lades note. The check was not honored, however, because it was drawn on uncollected funds.

In September 1981 Raymond brought the civil action against Rodgers, Penery, and Panky referred to above. At that time Brekke submitted his complaint against Rodgers to the State Bar. Raymond subsequently settled the case against Penery for $43,898; Rodgers apparently provided Penery with the settlement funds. Later, Raymond settled the case against Panky for $8,000. The case against Rodgers was suspended after he filed for bankruptcy in 1984.

In addition to the foregoing facts, the referee also found that Rodgers's explanation of the events in question was not credible: he relied on documentary evidence that he could not produce and at times gave answers that were disingenuous.

After finding these facts, the referee concluded that as a result of his conduct Rodgers violated the Rules of Professional Conduct and the Business and Professions Code by accepting employment for which he was not qualified, obtaining an interest adverse to a client, deceiving opposing counsel and the probate court, and commingling his client's funds with his own.

As evidence in mitigation the referee found that no other complaints had been filed against Rodgers in the five years since the State Bar began its investigation. In aggravation he determined that Rodgers's answers throughout the hearing were evasive, that at some points he lied about his involvement, and that such conduct demonstrated a failure to appreciate the harm he had caused to his client. In addition, the referee found that Rodgers failed to appreciate the inherent impropriety of his actions and refused to take any steps to ameliorate the consequences of his wrongdoing until he was compelled to do so.

In view of the foregoing, the referee recommended that Rodgers be suspended for 90 days.

Rodgers sought review of the referee's decision, but the State Bar did not. On review the department, by a vote of the twelve members to none (four

members not voting), adopted substantially all the referee's findings of fact and most of his conclusions of law. Specifically it concluded as follows.

By persuading Penery to transfer conservatorship funds to himself for investment with Panky, Rodgers entered into a business transaction with a client that required him to fully disclose the nature of his past business dealings with Panky, explain in writing the terms of the loan agreement, and encourage consultation with outside counsel. Because Rodgers failed to conduct himself as required, he violated rule 5-101[3] of the Rules of Professional Conduct[4] as well as Business and Professions Code[5] section 6068.[6] In addition, when Rodgers secured the loans to Panky with his own assets he obtained an interest that was potentially adverse to Penery and the conservatorship in violation of rules 5-101 and 5-102(B).[7]

Rodgers was also guilty of numerous acts of dishonesty and intentional concealment as a result of his failure to disclose the loans to the probate court and opposing counsel. He intentionally delayed filing the required inventory of the conservatee's assets, intentionally failed to have the assignments recorded, and fraudulently led Brekke, Raymond, and Penery to believe that the loans were properly secured by his own assets. His conduct was contrary to his oath as an attorney and involved moral turpitude, in violation of sections 6068 and 6106.[8]

---

[3] Rule 5-101 states: "A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto."

[4] Unless otherwise indicated all rule references are to the Rules of Professional Conduct of the State Bar of California.

[5] Unless otherwise indicated all code references are to the Business and Professions Code.

[6] Section 6068 declares in relevant part: "It is the duty of an attorney:

". . . . . . . . . . . . . . . . .

"(b) To maintain the respect due to the courts of justice and judicial officers. . . .

". . . . . . . . . . . . . . . . .

"(d) To employ, for the purpose of maintaining the causes confided to him or her such means only as are consistent with truth, and never to seek to mislead the judge or judicial officer by an artifice or false statement of fact or law. . . .

". . . . . . . . . . . . . . . . .

"(g) Not to encourage either the commencement or the continuance of an action or proceeding from any corrupt motive of passion or interest."

[7] Rule 5-102(B) states: "A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned."

[8] Section 6106 states: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or

In addition to committing dishonest acts, Rodgers wilfully violated court orders on at least two occasions. By failing to promptly submit an inventory of the estate's assets in response to an order of the probate court and by delaying the delivery of the proceeds of the Lades note to the public guardian, he violated section 6103[9] and expressed contempt for the lawful orders of a court. Moreover, because the check he ultimately delivered to the public guardian was not honored because of uncollected funds, he again ignored an order of the court in violation of section 6103.

Finally, Rodgers improperly commingled a client's funds with his own when he failed to deposit the monthly payments on the Lades note into his client trust account or into an account for the conservatorship. His conduct constituted a wilful violation of rule 8-101.[10]

The department concluded that numerous aggravating circumstances outweighed the factors in mitigation. It determined that Rodgers's conduct evinced multiple acts of wrongdoing over an extended period of time, was surrounded by attempts to conceal his improprieties, and significantly harmed a client and the administration of justice.

The department recommended disbarment, rather than the 90-day suspension proposed by the referee, because it determined that the referee's recommendation was "clearly insufficient."

■ In challenging the department's decision, Rodgers initially contends that the five years between the time the complaint was filed and the notice to show cause was issued constituted an unreasonable delay that deprived him of due process. Mere lapse of time, however, is neither a denial of due process nor a jurisdictional defect in attorney disciplinary proceedings. (*Ramirez* v. *State Bar* (1980) 28 Cal.3d 402, 412 [169 Cal.Rptr. 206, 619 P.2d 399].) Instead, the passage of time results in a denial of due process only when the petitioner makes a showing of specific prejudice. (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 449 [113 Cal.Rptr. 602, 521 P.2d 858].)

---

otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension."

[9]Section 6103 prescribes that "A willful disobedience or violation of an order of the court requiring him to do or forbear an act connected with or in the course of his profession, which he ought in good faith to do or forbear, and any violation of the oath taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension."

[10]Rule 8-101 provides, in relevant part: "(A) All funds received or held for the benefit of clients by a member of the State Bar . . . shall be deposited in one or more identifiable bank accounts labelled 'Trust Account' . . . and no funds belonging to the member of the State Bar or firm of which he is a member shall be deposited therein or otherwise commingled therewith. . . ."

It does not appear that the delay in these proceedings was unreasonable. While this matter was pending for almost five years, most of the delay of which Rodgers complains was justified by the pendency of the civil action filed by Raymond. Rule 350(b) of the Rules of Procedure of the State Bar provides for the suspension of disciplinary proceedings until the disposition of civil actions arising out of the same transaction. Thus, the department acted appropriately in suspending the proceedings here.

More important, Rodgers cannot show prejudice. He claims that Raymond has died and the attorney he originally retained for his defense has "literally disappeared" with all of the relevant records. At the threshold, we note a finding by the referee that aside from the suspension of the proceedings during the pendency of the Raymond action much of the delay in this matter is attributable to Rodgers's failure to cooperate. Further, we fail to see, and certainly are not shown, how Raymond's testimony would have been material and beneficial to the defense. Moreover, we find it difficult to believe that Rodgers, as an attorney, would fail to preserve the records that he claims would exonerate him. ■ An attorney's failure to keep adequate records or proper accounts is inherently suspicious and can support an inference that his testimony is untrue. (See *Walter* v. *State Bar* (1970) 2 Cal.3d 880, 889 [87 Cal.Rptr. 833, 471 P.2d 481].) ■ Finally, despite the considerable time he had to prepare his defense, Rodgers did not seriously attempt to gather the documentary evidence that he claimed would exonerate him. For example, when he was called upon during the hearing to produce easily accessible evidence that he claimed would have exculpated him, such as bank records and documents from the probate court file, he failed to do so. He conceded that he did not request or review the probate court file in preparation for the hearing.

In light of the foregoing, Rodgers's claim of prejudice appears specious. ■ He also contends that the proceedings violated his right to due process in another way. He argues that because the State Bar complaint was based on charges made by opposing counsel Brekke and not by his client Penery, he was barred by the attorney-client privilege from revealing confidential information that would have helped in his defense. The point is also without merit.

There is no indication that Rodgers did not in fact reveal all the information he thought might be helpful to his case. Indeed, during the hearing he never once invoked the attorney-client privilege on behalf of a client. In his defense, he detailed his professional relationship with Penery—revealing many facts about her personal life during the period in question—and disclosed numerous conversations he had with her concerning such matters as the filing of the inventory and the investing of the estate's assets.

 Rodgers further contends that practically all the department's findings of fact must be set aside. He claims in substance that each finding he challenges is infirm for one or both of the following reasons: (1) it is unreliable as a matter of law because he was prevented from introducing relevant evidence by the attorney-client privilege; and (2) it is not supported by sufficient evidence. The argument is unpersuasive.

First, as stated above we have discovered no indication that Rodgers did not reveal all the information he thought might be helpful in his case. Second, having considered the record closely we believe that each of the department's findings is adequately supported.

Although it is not necessary to address each of Rodgers's attacks individually, we shall nevertheless consider a number of his points in greater detail.

 While we independently review the evidence in each case, we view the findings of the State Bar Court with "great deference, particularly when based on evaluations of credibility." (*Maltaman* v. *State Bar* (1987) 43 Cal.3d 924, 932 [239 Cal.Rptr. 687, 741 P.2d 185].) The petitioner bears the burden of demonstrating that the findings are erroneous (*Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82]) and must demonstrate, by convincing proof and to a reasonable certainty, that the charges of unprofessional conduct cannot be sustained (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 12 [206 Cal.Rptr. 373, 686 P.2d 1177]). Merely repeating conflicts in the evidence does not satisfy this burden. (*Kelly* v. *State Bar* (1988) 45 Cal.3d 649, 656 [247 Cal.Rptr. 608, 754 P.2d 1104].)

 In attacking the findings Rodgers simply reiterates his testimony and asks us to credit his version of the events at issue. We generally decline such requests. (*Gary* v. *State Bar* (1988) 44 Cal.3d 820, 826 [244 Cal.Rptr. 482, 749 P.2d 1336].) We defer to the hearing panel's evaluation of conflicting testimony because it was in a better position to evaluate the demeanor of the witnesses and the character of their testimony. (*Arden* v. *State Bar* (1987) 43 Cal.3d 713, 725 [239 Cal.Rptr. 68, 739 P.2d 1236, A.L.R.4th 3531].) After a review of the record, we cannot reject the referee's determination that Rodgers's explanation of the relevant events was inherently implausible—especially in light of the fact that he failed to provide crucial documentary evidence, relying instead on excuses that the referee found to be disingenuous.

 Rodgers claims that he merely "facilitated" a loan between his clients Penery and Panky and did not obtain any interest adverse to either; he maintains that he did not persuade Penery to lend Raymond's funds to

Panky and that he had no control over the loan proceeds. The record belies the assertion.

However Rodgers chooses to "explain" his actions, it is nonetheless apparent that he arranged for Penery to lend Panky money from Raymond's estate. Moreover, he clearly benefited from these transactions: he received most of the proceeds of one loan to cover Panky's legal expenses. Also, by pledging his assets to secure Panky's notes, he put himself in a position in which he might have been required to choose between conflicting duties to his clients and his own financial interest. Indeed, the record discloses that he was faced with just such a conflict with regard to the Lades note. Although the note was assigned to Penery as security for Panky's debt, he subsequently assigned the note to secure a debt for his father. He thereby resolved the conflicting needs of his family and his client by putting the former ahead of the latter.

Rodgers also claims that he did not fail to deposit monthly payments from the Lades note into his client trust account or an account for the conservatorship, and therefore did not improperly commingle client's funds with his own. He testified he never received any money on the note. His testimony, however, is not believable. The probate court found that Rodgers had in fact received payments and ordered him to turn them over to the estate. Rather than appeal this determination, he acknowledged his responsibility and purported to comply with the order by offering the public guardian a check for $6,300 that was drawn on his own account.

Finally, Rodgers claims that he did not fraudulently lead Penery and Brekke to believe that the loans to Panky were properly secured by his own assets. He asserts that the assignments of his interests in the Lades and Mohanna notes were in fact notarized and could have been recorded, but that Penery simply failed to do so. Once again, he relies only on his own version of the events. This version, however, is implausible in light of his subsequent assignment of the Lades note. Despite his protestations, Rodgers's subsequent assignment of the Lades note, without notice to either Penery or Brekke, was a dishonest act that potentially impaired the security in the Panky loans, deceived Penery and Brekke, and violated his duty to protect Penery's interests.

Rodgers's last contention is that all the department's conclusions of law must be rejected. He argues in substance that each conclusion is unsound for one or more of the following broad reasons: (1) it is predicated on an evidentiary void attributable to the operation of the attorney-client privilege; (2) it is based on findings not supported by sufficient evidence; and (3) it is contrary to law. The argument is not persuasive.

First, as we concluded above there is no indication of an evidentiary void attributable to the attorney-client privilege: Rodgers evidently revealed all the information he thought might be helpful to his case. Second, as we determined above the findings of fact are indeed adequately supported. Third, each of the conclusions is plainly consistent with the law.

Again, although it is not necessary to address each of Rodgers's attacks individually, we shall nevertheless consider a number of the significant findings in greater detail.

■ Rodgers claims that he did not violate rule 5-101. ■ We have held that rule 5-101 prohibits an attorney from entering into *any* loan transaction with a client if it is reasonably foreseeable that his acquisition [of the loan] might be detrimental, i.e., adverse to the interests of his client. (*Hawk* v. *State Bar* (1988) 45 Cal.3d 589, 599 [247 Cal.Rptr. 599, 754 P.2d 1096].) The rule sets out certain requirements of fairness and full disclosure that an attorney must satisfy when she enters into a business transaction with a client. ■ A review of the record demonstrates that Rodgers's involvement in Penery's loans to Panky violated rule 5-101.

Rodgers argues that he disclosed all relevant information to Penery. The record is otherwise. In arranging the loans he did not reveal his prior business and professional relationship with Panky. Moreover, he presented the transaction to Penery in such a manner as to demonstrate that he was less than forthright and did not disclose information that might have discouraged Penery from agreeing to the loans. Finally, there is no indication that Rodgers advised Penery to consult independent counsel or that she did so.

■ There is always a danger to the fiduciary relationship between an attorney and his client when the two enter into business dealings. While such transactions are not prohibited, they are scrutinized with the utmost strictness for any unfairness. (*Beery* v. *State Bar* (1987) 43 Cal.3d 802, 812-813 [239 Cal.Rptr. 121, 739 P.2d 1289].) The burden of proof is on the attorney to show that the dealings between him and his client were fair and reasonable. (*Hunniecutt* v. *State Bar* (1988) 44 Cal.3d 362, 372-373 [243 Cal.Rptr. 699, 748 P.2d 1161].)

■ Rodgers has not met his burden of demonstrating that the transaction was fair to Penery. One indicium of unfairness is the fact that the terms of the original loans were not in writing and were not for a definite term. Another indicium is the absence of any real security for the loan. (*Hunniecutt* v. *State Bar, supra,* 44 Cal.3d at p. 373; *Beery* v. *State Bar, supra,* 43 Cal.3d at pp. 814-815.)

 Rodgers not only entered into an improper business transaction with his client, he also attempted to conceal his wrongful acts. He allowed Penery to erroneously believe that her loans to Panky were secured when in fact he had pledged part of the security to guarantee a separate debt for his father. He was repeatedly evasive and deceitful in his dealings with Brekke. He continually promised to provide him with full disclosure of the loan transactions and an inventory of the conservatee's estate, but consistently failed to make good that promise. When he was ordered by the probate court to turn over the monthly payments on the Lades note, he offered the public guardian a bad check, another dishonest act that violated his ethical duties. (*Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 577 [119 Cal.Rptr. 335, 531 P.2d 1119].) "Such dishonesty is reprehensible and violates the attorney's highest duty of fidelity toward his client and the profession." (*Carter* v. *State Bar* (1988) 44 Cal.3d 1091, 1100 [245 Cal.Rptr. 628, 751 P.2d 894].)

 Rodgers claims that he is not guilty of any act of moral turpitude. He argues that in failing to cooperate with opposing counsel or to disclose matters to the probate court he was merely advancing the best interests of his client.

Even if we were to assume that the loans to Panky were in Penery's best interests, we could not sanction Rodgers's use of deception to advance those interests. Subdivision (d) of section 6068 obligates an attorney to "employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth." The statute requires an attorney to refrain from misleading and deceptive acts without qualification. (*Di Sabatino* v. *State Bar* (1980) 27 Cal.3d 159, 162 [162 Cal.Rptr. 458, 606 P.2d 765]). It does not admit of any exceptions.

 No act of concealment or dishonesty is more reprehensible than Rodgers's attempts to mislead the probate court. Although he argues that he had no duty to disclose information to the probate court because he was not the conservator of Raymond's estate, it is manifest that he actively misled the court and consciously ignored its orders. He repeatedly violated the prohibitions of section 6068, subdivision (d), in his dealings with the probate court: he failed to assist or encourage Penery to submit an inventory of the conservatee's estate, in violation of Probate Code section 2610, subdivision (a), and he made no attempt to ask for a continuance or to explain the delay; he encouraged Penery to lend Panky funds from Raymond's estate but did not inform the probate court of these loans as required by Probate Code section 2570; when ordered to produce an inventory or to turn over conservatorship funds he consistently failed to timely comply with the orders; and, when he finally filed the inventory he did not

disclose the true nature of the loans. As the department properly concluded, Rodgers designed these machinations to conceal the fact that he had improperly allowed funds from Raymond's estate to be lent to a client for his personal benefit. This court has denounced such misleading conduct and has not hesitated to impose discipline in such cases. (*Giovanazzi* v. *State Bar* (1980) 28 Cal.3d 465, 473 [169 Cal.Rptr. 581, 619 P.2d 1005]; *Di Sabatino* v. *State Bar, supra,* 27 Cal.3d at pp. 162-163.)

Finally, Rodgers claims that he did not commingle client funds with his own because he never received any payments on the Lades note. This point, however, has been rejected above.

Having considered the matter closely, we believe that the department's findings are supported by the evidence and its conclusions of law are sound. Accordingly, we adopt those determinations as our own.

■■■ Although it is clear that discipline is required in this case, it is not so clear that disbarment is the appropriate sanction. ■■■ We may, of course, adopt the department's determinations as to misconduct and yet revise its recommendations regarding discipline. (*Price* v. *State Bar* (1982) 30 Cal.3d 537, 548 [179 Cal.Rptr. 914, 638 P.2d 1311].) ■■■ While we believe Rodgers's acts are reprehensible and merit a period of actual suspension, we are not convinced the department acted appropriately when it dramatically enhanced the referee's recommended discipline from 90 days' actual suspension to disbarment.

■■■ We have frequently observed that the disciplinary recommendation of the State Bar is entitled to great weight, and that the department's proposal for discipline is entitled to greater weight than that of the hearing panel. (See, e.g., *Alberton* v. *State Bar, supra,* 37 Cal.3d at p. 14.) It is clear, however, that the ultimate determination regarding discipline rests with the court. (*Ibid.*) ■■■ In this case there is a remarkable disparity between the discipline recommended by the referee and the department. While we agree with the department that the referee's recommendation is too lenient, we nonetheless conclude that the department's discipline is too harsh. (See *Galardi* v. *State Bar* (1987) 43 Cal.3d 683, 694 [238 Cal.Rptr. 774, 739 P.2d 134].)

■■■ The imposition of attorney discipline does not issue from a fixed formula but from a balanced consideration of all relevant factors, including aggravating and mitigating circumstances. (*Doyle* v. *State Bar* (1982) 32 Cal.3d 12, 24 [184 Cal.Rptr. 720, 648 P.2d 942].)

■■,■■ In mitigation, as both the referee and the department noted, no other charges have been filed against Rodgers in the years since Brekke

filed his complaint with the State Bar. In the intervening period, Rodgers has continued his practice without suffering additional charges of unethical conduct, thus demonstrating an ability to adhere to acceptable standards of professional behavior. (*Cain* v. *State Bar* (1978) 21 Cal.3d 523, 526 [146 Cal.Rptr. 737, 579 P.2d 1053].) In addition, we may consider the fact that Rodgers has been practicing law for almost 20 years with no prior record of discipline. (*Beery* v. *State Bar, supra,* 43 Cal.3d at p. 816; *Lewis* v. *State Bar* (1973) 9 Cal.3d 704, 715 [108 Cal.Rptr. 821, 511 P.2d 1173].)

Balanced against these mitigating factors are a host of aggravating circumstances. Rodgers committed a series of unethical acts in his handling of the Raymond conservatorship. ██ ██ Because these multiple offenses were "committed in concert, substantial discipline is warranted." (*Davis* v. *State Bar* (1983) 33 Cal.3d 231, 241 [188 Cal.Rptr. 441, 655 P.2d 1276].) Also, Rodgers's conduct significantly harmed Raymond: she was compelled to hire an attorney and spend much time attempting to regain the assets that were improperly lent to Panky through Rodgers's efforts. Such harm is also regarded as an aggravating circumstance. (Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct, std. 1.2(b)(iv).)

Perhaps the most significant factor in aggravation, however, is the fact that Rodgers consistently attempted to conceal his wrongful acts. (*Id.,* std. 1.2(b)(iii).) The repeated evasions and deceit surrounding Rodgers's explanation of the loans to Panky are inconsistent with the high degree of fidelity owed by an attorney to his profession and to the public. His dishonest conduct continued during the State Bar proceedings. At the hearing, the referee determined that Rodgers was evasive and showed a lack of candor. His failure to produce records that would supposedly have exonerated him, and his consistent refusal to accept any responsibility for Penery's loans of the estate's funds, indicate that he either did not understand the impropriety of his conduct or continued to be less than forthright about the transactions. ██ Increased discipline is warranted by an attorney's lack of insight into the wrongfulness of his actions. (*Beery* v. *State Bar, supra,* 43 Cal.3d at p. 816.)

██ Rodgers is clearly guilty of entering into a business transaction with an uninformed client, obtaining an interest adverse to a client, commingling client funds, and dishonestly concealing his wrongful conduct. Dishonest conduct by a member of the bar, standing alone, warrants suspension or disbarment. (§ 6106.) Moreover, violations of rule 5-101 have resulted in discipline as severe as two years' actual suspension. (*Beery* v. *State Bar, supra,* 43 Cal.3d 802.)

■ Nevertheless, when we impose discipline we must seek, not to punish the attorney, but to protect the public, the profession, and the courts. (*In re Nadrich* (1988) 44 Cal.3d 271, 276 [243 Cal.Rptr. 218, 747 P.2d 1146].) ■ Thus, although we have the authority to disbar Rodgers, we decline to order such a drastic sanction: it seems unnecessary to achieve the goal we are obligated to achieve. It is also noteworthy that the State Bar did not seek review of the 90-day actual suspension recommended by the referee.

The recommended discipline of disbarment is greater than the discipline we have imposed under similar circumstances in the past. (See *Hunniecutt v. State Bar, supra,* 44 Cal.3d 362 [engaging in improper business transaction with client, converting client's investment to unsecured loan, abandoning clients: three years' probation, ninety days' actual suspension]; *Hawk v. State Bar, supra,* 45 Cal.3d 589 [improper business transaction, accepting a promissory note secured by deed of trust in client's property, misleading client, two prior instances of discipline: four years' probation, six months' actual suspension]; *Beery v. State Bar, supra,* 43 Cal.3d 802 [improper business transaction, obtaining loan from client, representing adverse interests, fraudulently guaranteeing loan: five years' probation, two years' actual suspension]; *Ritter v. State Bar* (1985) 40 Cal.3d 595 [221 Cal.Rptr. 134, 709 P.2d 1303] [improper business transaction, receiving loan from client: two years' probation, sixty days' actual suspension]; *Lewis v. State Bar* (1981) 28 Cal.3d 683 [170 Cal.Rptr. 634, 621 P.2d 258] [improper business transaction, negligent handling of client affairs, failure to maintain records of clients' funds: one year's probation, no actual suspension]; *Giovanazzi v. State Bar, supra,* 28 Cal.3d 465 [dishonesty, false pleading, misappropriation, obtaining loan from client at usurious rates without adequate security: three years' probation, thirty days' actual suspension]; *Worth v. State Bar* (1976) 17 Cal.3d 337 [130 Cal.Rptr. 712, 551 P.2d 16] [obtaining loans by misrepresentation, failure to reduce loan agreement to writing, commingling, failing to account: three years' probation, one year's actual suspension]; *Clancy v. State Bar* (1969) 71 Cal.2d 140 [77 Cal.Rptr. 657, 454 P.2d 329] [concealing material facts in obtaining loan from client, dishonest attempts to conceal transaction: three years' probation, six months' actual suspension].) ■ While past disciplinary results are not binding on this court they are nevertheless entitled to consideration. (*Beery v. State Bar, supra,* 43 Cal.3d at p. 816.)

■ Because we must seek to protect the public, the profession, and the courts, it is appropriate to suspend Rodgers from the practice of law for five years and to stay that suspension on the condition that he be actually suspended for two years and placed on probation for the remainder of the five-year period. Such discipline is proportional to the harm Rodgers

caused, comports with the discipline we have imposed in similar cases, and recognizes that Rodgers has no prior record of discipline. The probationary term will enable the State Bar to carefully monitor Rodgers and ensure that his rehabilitation is well established. (See *In re Nadrich, supra,* 44 Cal.3d 271, 279.)

We order that petitioner, Bobby D. Rodgers, be suspended from the practice of law for the period of five years, that execution of the order of suspension be stayed and that petitioner be placed on probation for the period of five years upon the following conditions: 1. Petitioner shall be actually suspended from the practice of law in the State of California for the first two years of the period of probation;

2. During the period of probation, he shall comply with the provisions of the State Bar Act and the Rules of Professional Conduct of the State Bar of California;

3. Petitioner shall report in writing to the Office of the Clerk, State Bar Court, San Francisco, on a quarterly basis, certifying by affidavit or under penalty of perjury that he has complied with the terms of this order during the period covered by the report;

4. During the period of probation, petitioner shall maintain with the Office of the Clerk, State Bar Court, San Francisco, his current office or other address for State Bar purposes, and his residence address;

5. Except to the extent prohibited by the attorney-client privilege or the privilege against self-incrimination, petitioner shall answer fully, promptly and truthfully any inquiry directed to him personally or in writing by the Presiding Referee of the State Bar Court or the designee of the presiding referee relating to whether petitioner is complying or has complied with these terms of probation;

6. Petitioner is referred to the Department of Probation, State Bar Court, for assignment of a probation monitor referee. Petitioner shall promptly review the terms and conditions of his probation with the probation monitor referee to establish a manner and schedule of compliance, consistent with these terms of probation. During the period of his probation, petitioner shall fully furnish any reports concerning his compliance that may be required by the probation monitor referee and shall cooperate fully with the probation monitor referee to facilitate the discharge of the referee's duties as identified in rule 611, Rules of Procedure of the State Bar;

7. Petitioner shall be required to submit to his probation monitor referee a biannual audit of his client trust fund account compiled by an accountant.

The audit shall contain complete information concerning all money received and disbursed during the period since the previous audit.

It is further ordered that, during the period of his actual suspension from the practice of law, petitioner shall take and pass the Professional Responsibility Examination given by the National Conference of Bar Examiners.

Petitioner is ordered to comply with rule 955 of the California Rules of Court and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. (See Bus. & Prof. Code, § 6126, subd. (c).)

This order shall be effective on the finality of our opinion.