[L.A. No. 31419. July 16, 1987.]

In re BERNARD SABBATH STRICK on Disbarment.

COUNSEL

James Toledano and Toledano & Charnley for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Michael Gerner and Marie M. Moffat for Respondent.

OPINION

**THE COURT.**—The Review Department of the State Bar Court unanimously recommends that petitioner Bernard Sabbath Strick be disbarred based upon his conviction for criminal offenses involving moral turpitude. The hearing panel had proposed suspension for five years, the execution of which was to be stayed, and probation for five years with close supervision. Petitioner urges that the findings of fact, as adopted and amended by the review department, do not provide a basis for disbarment. He argues that the probation conditions proposed by the hearing panel are sufficient to protect the public, and that the sanction of disbarment serves only to punish him for crimes for which he has already been punished. While petitioner's rehabilitation and demonstrated commitment to the practice of law are compelling, we conclude that the sanction of disbarment is appropriate under the circumstances. Thus, we adopt the recommendation of the review department.

This matter was previously before us in *In re Strick* (1983) 34 Cal.3d 891 [196 Cal.Rptr. 509, 671 P.2d 1251]. In that proceeding, the State Bar had recommended that petitioner be disbarred on the basis of his conviction in May 1980 of one count of forgery of prescription (Bus. & Prof. Code,

§ 4390), and his conviction in February 1980 of one count of voluntary manslaughter (Pen. Code, § 192, subd. (a)) and one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)).[1] As to the manslaughter and assault convictions, we held that the State Bar had no jurisdiction to impose final discipline until the convictions were final. However, based upon the testimony at the criminal trial, we found probable cause that the offenses involved moral turpitude. Accordingly, we placed petitioner on interim suspension pending final disciplinary action. As to the forgery offense, we found that the record relied upon by the State Bar did not support either interim suspension or final discipline. We then referred both matters to the State Bar for a hearing and report on discipline pursuant to Business and Professions Code section 6102, subdivision (b). The proceedings conducted on remand are the subject of this decision.

## I.

Petitioner was admitted to the practice of law in 1972. In 1976, he began to abuse opiates and other drugs, and neglected his law practice. Complaints were filed with the State Bar alleging that petitioner was not representing his clients in a diligent and competent manner. After the State Bar initiated proceedings pursuant to Business and Professions Code section 6007, subdivision (b), petitioner stipulated to placement on inactive status in July 1978.

In August 1978, petitioner was charged with one count of receiving stolen prescription blanks (Pen. Code, § 496) and two counts of uttering a forged prescription (Bus. & Prof. Code, § 4390). He pled nolo contendere to one count of uttering a forged prescription and the other two counts were dismissed. He was sentenced to 180 days in the Los Angeles County jail.

In March 1979, petitioner was charged with one count of murder with a handgun (Pen. Code, § 187), and one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)). The jury found petitioner guilty of voluntary manslaughter (Pen. Code, § 192, subd. (a)) and assault with a deadly weapon. Both offenses were found to have been committed by use of a firearm (Pen. Code, § 12202.5). Petitioner was given concurrent sentences of four years in state prison for the voluntary manslaughter conviction with an

---

[1] Petitioner was also convicted of one count of uttering a forged prescription for narcotics (Health & Saf. Code, § 11368) based on an event which occurred in August 1979. After we referred the matter to the State Bar for a recommendation as to what discipline, if any, was warranted, petitioner successfully set aside his conviction by writ of habeas corpus. We vacated our referral order and the State Bar dropped further proceedings concerning this conviction. Accordingly, this matter is not before us and is not part of our decision.

enhancement of two years for use of a firearm, and three years for the assault conviction. He served three years and nine months in state prison.

The events which led to the manslaughter and assault convictions occurred in December 1978, about six months after petitioner was placed on inactive status. Petitioner had spent the day ingesting drugs and alcohol with Vicki L. (Vicki), the 18-year-old woman with whom he shared his apartment and Peter V. (Peter), a 19-year-old friend of Vicki. Prior to this day, petitioner had asked Vicki to move out and to return to him the keys to his apartment and his car. At the end of the day, Peter and Vicki went to a party. As she left, Vicki told petitioner that she had another place to stay and that she would not return. Nevertheless, Vicki and Peter returned to petitioner's apartment late that evening and slept on a mattress in the living room.

When petitioner awakened about 5 a.m., he was angry to find Vicki and Peter in his apartment. He awakened Vicki and demanded that she and Peter leave immediately. When they did not do so, he went to his bedroom and retrieved one of his several guns. The gun was loaded and the safety was off. He returned to the living room and threatened Vicki and Peter with the gun. A struggle ensued and the gun discharged several times, finally striking and killing Peter.

Petitioner directed Vicki to telephone for an ambulance and the police. He then pulled Peter's naked and bleeding body into the common hallway and left it there without administering any aid. He hid the gun in a chair before police arrived. Police officers testified that when they entered, petitioner told them that Peter had tried to break in. He also told them that he did not know where the gun was because Vicki had been "waving it around."

## II.

On August 29, 1984, petitioner's case was heard by a hearing panel consisting of one referee by stipulation of the parties. (Rules Proc. of State Bar, rule 588(c).) The parties also stipulated to the facts (Rules Proc. of State Bar, rule 401) and agreed that petitioner was bound by the stipulation regardless of the discipline recommended or imposed. Although the State Bar examiner and petitioner had agreed on the appropriate discipline,[2] the parties agreed to provide testimony by additional witnesses for the benefit of the referee. Testimony was taken from petitioner's psychologist, Dr. Glas-

---

[2] The parties had proposed a five-year suspension, execution stayed, with probation conditions substantially similar to those ultimately recommended by the hearing panel. (See p. 651, *infra*.)

ser, and from Donald Wager and Leonard Levine, two attorneys for whom petitioner had worked since his release from prison. Petitioner also testified, and submitted letters on his behalf from a judge, five attorneys, four correctional counselors, his psychologist and a rabbi.

Dr. Glasser testified that he treated petitioner for over two years when the latter was a teenager, and again when petitioner was released from prison. He stated that petitioner suffered from severe emotional problems stemming from his poor relationship with his mother, and her unrealistic expectations of him. He diagnosed petitioner as obsessive compulsive and depressive. While petitioner had made substantial progress toward eradicating his drug problem and had gained insight into his emotional problems, it was essential that his personal and professional life be monitored if he were permitted to practice law again. Dr. Glasser testified that he felt petitioner would not be a "danger or menace" to his clients, that he had observed no indication of violent tendencies and that petitioner should be given the chance to practice law and to prove himself. However, Dr. Glasser believed that it would be preferable for petitioner to practice in a structured environment to minimize stress and to help him maintain his emotional equilibrium.

Mr. Wager represented petitioner in both the forgery and manslaughter matters, and has retained petitioner to perform research and writing assignments. He testified that petitioner's former drugged and chaotic existence has changed to one of competence and demonstrated excellence in his profession. He felt that permitting petitioner to practice law would benefit both petitioner and the public.

Mr. Levine, also an attorney, testified that he had known petitioner since junior high school and had recently retained him to perform legal work. He testified about the high quality of petitioner's work, and his reliability. Mr. Levine concluded that petitioner would pose no danger to the public, and would provide a benefit to society if permitted to resume the practice of law.

Petitioner testified to his version of the events that occurred on the night he shot Peter. He stated that he was feeling ill that evening because he had hepatitis and was withdrawing from the use of opiates. When he awoke early in the morning, he was disoriented, in pain and feeling "paranoid" as a result of what he believes were seizures that he suffered during his sleep. When he discovered that Vicki had returned to the apartment despite their agreement, he became angry and they quarreled. She agreed to leave and he went into the bedroom to smoke a cigarette. When he came out and discovered that she had made no move to leave, he went into the bedroom to retrieve a gun. He felt that he could not physically remove Vicki and

Peter, but that he could scare them with the gun. Vicki tried to grab the gun and "one shot was fired." All three struggled for the gun, and another shot was fired. Petitioner then tried to wound Peter in the shoulder, but the gun "went off semi-volitional" when he did not have control over it. He did not intend to kill anyone.

Petitioner also testified about his gradual addiction to opiates and its effect on his law practice, his rehabilitation in prison and his legal work since his release from prison. He stated that he thought a structured work environment would be good for him, and that he intellectually understood the source of his problems with his mother, but that "emotionally, she can still get to me." He also testified that he accepts total responsibility for the events leading to Peter's death.

The bar examiner noted that, in the 1981 proceeding, he had strenuously argued that petitioner should be disbarred. He stated that his recommendation had changed for two reasons. First, he referred to *In re Patton* (Bar Misc. No. 4196), an unreported State Bar case in which the petitioner killed his wife and received 32 months of actual suspension.[3] Second, he noted that petitioner could apply for reinstatement relatively shortly[4] and that a strong case could be made in favor of reinstatement. Unlike probation, there is no mechanism for placing conditions on reinstatement. Thus, to the extent the public and petitioner would benefit from a structure in which petitioner is closely monitored, probation with conditions was preferable to disbarment.

The hearing panel concluded that the acts underlying petitioner's prescription forgery conviction, although acts of dishonesty and immorality, were not "acts of baseness in social and professional duties" and thus did not constitute moral turpitude. The panel found that when these events took place, petitioner was addicted to drugs, he did not profit from the conduct underlying any of the counts, and the drugs obtained by the use of forged prescriptions were for his personal use.

As to the voluntary manslaughter conviction, the hearing panel concluded that petitioner's acts constituted a conscious disregard for the rights of others. "They arose not only from his addiction to drugs, but also from

[3] The examiner apparently offered *Patton* for guidance on the appropriate level of discipline in homicide cases.

[4] State Bar Rules of Procedure, rule 662 provides, in part: "No petition shall be filed within five years after the effective date of interim suspension or disbarment or resignation whichever first occured. . . ." Since this court's decision placing petitioner on interim suspension was filed on November 10, 1983, he will be eligible to apply for reinstatement on November 10, 1988.

personality defects which led to this use and abuse of drugs in the first place.[5]

The hearing panel found as factors in aggravation that "petitioner does not fully appreciate the gravity of the offense constituting the manslaughter conviction" and that he "is not presently capable of the practice of law without supervision." However, it found substantial factors in mitigation, as follows: 1) petitioner's conduct did not arise in the course and scope of his duties as an attorney; 2) he voluntarily enrolled as an inactive member of the bar; 3) he has no prior record of discipline; 4) he has voluntarily sought psychological counseling both while he was in prison and since his release; 5) he has been candid and cooperative with the bar; 6) he has substantial remorse over the events that occurred, as he perceives them; 7) at the time of the acts underlying the convictions, he was suffering from severe personal psychological problems and drug addiction; 8) prior to the acts underlying the convictions, he devoted considerable time to community service activities, including extensive pro bono criminal defense; 9) he has maintained his learning in the law and has sufficient learning at this time to practice law; 10) he voluntarily enrolled in Alcoholics Anonymous in prison and maintains his involvement with that organization; 11) his mental attitude improved greatly during incarceration and he came to accept culpability for his criminal acts; 12) his conduct was laudatory during his incarceration; 13) he has gained substantial insight and control over the problems which led to his convictions through psychological counseling both in and out of prison; and 14) he has been able to prove his rehabilitation to even the most skeptical.

The hearing panel recommended that petitioner be suspended for five years, that execution be stayed, and that he be placed on probation for five years on the condition that he: 1) abstain from the use of intoxicants and controlled substances; 2) obtain psychiatric or psychological help; 3) participate actively in Alcoholics Anonymous or a similar organization; 4) comply with the provisions of the State Bar Act and Rules of Professional Conduct and submit a quarterly report to the State Bar certifying that he has done so; 5) pass the professional responsibility examination; 6) maintain his current office address with the State Bar and notify it within 10 days of any change; 7) answer fully and truthfully any inquiry from the State Bar Court concerning his compliance with the terms of his probation; and 8) cooperate fully with his assigned probation monitor. The hearing panel further recommended to the probation monitor that petitioner "should not

---

[5] The hearing panel did not specifically find that the manslaughter and assault convictions involved moral turpitude. However, such a conclusion is implicit in its recommendation of suspension and can be inferred from its conclusion that petitioner's acts showed a conscious disregard for the rights of others.

be allowed to practice law on his own without presenting clear and convincing evidence of his ability to do so."

## III.

On March 28, 1985, the review department held a public hearing on the subject of the discipline recommended by the hearing panel. The parties were asked to comment on: "1) whether the degree of discipline recommended is adequate in view of the findings of fact of the hearing panel; and 2) whether the hearing panel's recommendation that [petitioner] not be allowed to practice law on his own without presenting clear and convincing evidence of his ability to do so is workable and appropriate." At the hearing, the review department panel directed questions to both counsel, exhibiting its concern about whether an attorney who required supervision should be permitted to practice at all.

The review department amended and adopted the findings of the hearing panel. It deleted the findings that petitioner's trial testimony was more credible than that of Vicki, and that the jury must have so concluded given its voluntary manslaughter verdict; that petitioner still does not appreciate the gravity of his conduct; that petitioner's mental attitude improved greatly during incarceration; that he had gained substantial insight and control over his problems; and that he had been able to demonstrate his rehabilitation even to the most skeptical. It added the finding that petitioner requires continued psychiatric care for a severe depressive and obsessive state. The review department unanimously recommended that petitioner be disbarred because "the degree of discipline recommended by the Hearing Panel was insufficient in view of the gravity of the facts and circumstances surrounding [petitioner's] offenses and [ ] the record of State Bar proceedings demonstrates that [petitioner] should bear the burden of proving, over a sustained course of conduct that [he] is entitled and fit to practice law before again being permitted to so practice."

## IV.

Petitioner argues that the factual findings, as amended and adopted by the review department, do not support a finding of moral turpitude and do not support disbarment. He urges that the purpose of attorney discipline is not to punish, but to ascertain the attorney's present fitness to practice law and to inquire into the need to protect the public, the courts and the legal profession. (*Chasteen* v. *State Bar* (1985) 40 Cal.3d 586, 591 [220 Cal.Rptr. 842, 709 P.2d 861]; *In re Conflenti* (1981) 29 Cal.3d 120, 123 [172 Cal.Rptr. 203, 624 P.2d 253].) He contends that such protection is best insured through the probation conditions recommended by the hearing panel.

Petitioner bears the burden of showing that the review department recommendation is erroneous or unlawful. (Bus. & Prof. Code, § 6083, subd. (c); *Wren* v. *State Bar* (1983) 34 Cal.3d 81, 89-90 [192 Cal.Rptr. 743, 665 P.2d 515].) On review, this court attributes substantial weight to the State Bar's recommendation as to discipline. (*Olguin* v. *State Bar* (1980) 28 Cal.3d 195, 199 [167 Cal.Rptr. 876, 616 P.2d 858].) We must, however, exercise independent judgment in determining the appropriate discipline in any given case. (*Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82]; *Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 916 [180 Cal.Rptr. 831, 640 P.2d 1106].)

An attorney may be suspended or disbarred on the basis of his or her conviction of a crime involving moral turpitude. (Bus. & Prof. Code, § 6101, subd. (a).) Conviction of some crimes, particularly those involving intentional dishonesty for personal gain, establishes moral turpitude on its face. (See *In re Fahey* (1973) 8 Cal.3d 842, 849 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465].) However, the commission of some crimes, standing alone, does not implicate an attorney's fitness to practice law. In such a case, moral turpitude cannot be imputed from the conviction alone and inquiry must be made into the circumstances surrounding the commission of the crime. (See *In re Higbie* (1972) 6 Cal.3d 562, 569-570 [99 Cal.Rptr. 865, 493 P.2d 97]; *In re Rothrock* (1940) 16 Cal.2d 449, 453-454 [106 P.2d 907, 131 A.L.R. 226].)

In our former opinion in this case, we implicitly recognized that the crimes of which petitioner was convicted do not, per se, involve moral turpitude. (*In re Strick, supra,* 34 Cal.3d at p. 902.) For the purposes of determining the appropriateness of interim suspension pending appeal, we were required to find that the record of the conviction proceedings revealed probable cause that the crime involved moral turpitude. (Bus. & Prof. Code, § 6102, subd., (a).) We examined the conviction record, including a transcript of the testimony taken, and concluded that the evidence showed moral turpitude. We found that "[p]etitioner knowingly engaged in a prolonged course of illegal, drug-related conduct. The killing and assault resulted from his show of deadly force in an attempt to intimidate two persons younger than himself who presented no threat to him into acceding to his demand that they immediately rise from their drugged sleep and leave his house. After the shooting occurred, petitioner callously left the victim's naked body in a common hallway. He initially denied knowledge of the location of the weapon and sought to implicate the victim of the assault in the killing, but later admitted hiding the gun and initiating the confrontation. This course of conduct was certainly contrary to the accepted and customary rule of right and duty between persons [citation], showing disregard for the law and the safety of the public [citation] and reflecting poorly

on petitioner's honesty and integrity [citation]." (*In re Strick, supra,* at pp. 902-903.)

Petitioner's convictions are final and he has had adequate notice and opportunity to be heard by the State Bar Court. The record of the conviction proceedings has been augmented by the record of the State Bar proceedings, including petitioner's testimony. With the benefit of a fuller record, we must now determine whether the circumstances surrounding petitioner's commission of the crimes of which he was convicted involved moral turpitude warranting suspension or disbarment. (Bus. & Prof. Code, § 6102, subd. (d).) Whether the facts as found constitute moral turpitude is a question of law. (*In re Higbie, supra,* 6 Cal.3d at p. 569.)

While it is not conclusive, we are mindful of our prior determination that the record of petitioner's convictions revealed probable cause of moral turpitude. (See *In re Kirschke* (1976) 16 Cal.3d 902, 904 [129 Cal.Rptr. 780, 549 P.2d 548]; and *In re Hanley* (1975) 13 Cal.3d 448, 451 [119 Cal.Rptr. 5, 530 P.2d 1381].) Nothing in the record of the State Bar proceedings convinces us otherwise. Indeed, petitioner does not contradict the facts which we found to establish moral turpitude. Nor does his version of the relevant events diminish his culpability. Thus, we conclude that the circumstances surrounding petitioner's criminal conduct exhibited moral turpitude as a matter of law. We must determine, then, what degree of discipline is appropriate.

■ In determining the extent of discipline to be imposed we consider the facts of each case, taking into account any aggravating or mitigating factors. (*Tarver* v. *State Bar* (1984) 37 Cal.3d 122, 133 [207 Cal.Rptr. 302, 688 P.2d 911]; *Codiga* v. *State Bar* (1978) 20 Cal.3d 788, 796 [144 Cal.Rptr. 404, 575 P.2d 1186].) While petitioner has made commendable efforts at rehabilitation and presents compelling mitigating evidence, we agree with the review department that the gravity of his crimes and his present inability to practice law without supervision, counsel in favor of disbarment.

■ Petitioner strenuously argues that the discipline recommended by the hearing referee is sufficient to protect the public, maintain the integrity of the legal profession, and preserve public confidence in the legal profession. (*Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 514 [153 Cal.Rptr. 24, 591 P.2d 47]; *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].) He challenges the conclusion that he is unable to practice law without supervision. He claims that he offered to submit to close supervision and strict probation conditions in the spirit of compromise, and to allay any possible concerns about the protection of the public. He complains that he did not intend to suggest that he is presently unfit to

practice law, and that he should not be penalized for "err[ing] on the side of safety."

Petitioner is of course correct that the purpose of disciplinary proceedings is not to punish him but to ascertain his present fitness to practice law. (*In re Nevill* (1985) 39 Cal.3d 729, 736 [217 Cal.Rptr. 841, 704 P.2d 1332]; *Bradpiece* v. *State Bar, supra,* 10 Cal.3d at p. 748.) However, he misconceives the State Bar's position. The concern about his fitness does not stem from his willingness to submit to supervision, but from the explicit finding of the hearing panel that petitioner "is not presently capable of the practice of law without supervision." This finding is well supported by the testimony of petitioner's psychologist, who indicated that petitioner's emotional "edifice is still to a certain extent shakey [*sic*]," and that petitioner is not yet ready to practice law on his own.

Petitioner's emotional problems were serious enough in the past to lead to a drug addiction so overwhelming that he was willing to risk his promising career to obtain the drugs by forging prescriptions. The combined effect of the drugs and his psychological dysfunction culminated in his physical, emotional and professional deterioration, and ultimately in the death of another human being. It is not enough to assess petitioner's current functioning in the abstract. Given petitioner's history, the review department is perfectly justified in requiring him to exhibit enough stability over a sustained period of time to assure itself that petitioner is capable of practicing without any supervision.

Petitioner next adopts the examiner's argument that probation with supervision actually affords more protection than disbarment given the prospect of petitioner's imminent reinstatement. It is true that petitioner will be eligible to apply for reinstatement relatively soon. (See fn. 4, p. 650, *ante.*) And the rules do not provide for placing conditions on reinstatement. However, petitioner's reinstatement is not automatic. He must first pass the Professional Responsibility Examination and establish to the satisfaction of a majority of the hearing panel: "1) rehabilitation and present moral qualifications for readmission; and 2) present ability and learning in the general law." (Rules Proc. of State Bar, rule 667.) (7) After one is disbarred, the burden of proving good moral character is higher than when first admitted. (*Kepler* v. *The State Bar* (1932) 216 Cal. 52, 55 [13 P.2d 509].) While we express no opinion on the likelihood that petitioner will meet this burden, we find that the standard for reinstatement adequately protects the interests of the public and of the profession. (See *In re Nevill, supra,* 39 Cal.3d at pp. 738-739.)

Petitioner urges that the record does not provide a basis for the review department's decision to delete the hearing panel's factual findings that

petitioner's mental attitude improved during his incarceration and that he came to accept culpability for his acts; that through therapy he has gained substantial insight and control over the problems which led to his criminal conduct; and that upon his release from prison, he has been able to prove his rehabilitation even to the most skeptical. He points out that, while the court affords substantial weight to the review department's recommendation as to the appropriate discipline, the hearing panel's greater opportunity to observe and judge the credibility of the witnesses requires that great weight be given to its factual findings. (*Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 578 [119 Cal.Rptr. 335, 531 P.2d 1119].)

We agree that the record, both documentary and testimonial, supports the findings concerning petitioner's improved mental attitude and acceptance of culpability. And Dr. Glasser's testimony supports the finding that petitioner has gained insight and control over his problems. Moreover, there is no apparent reason to discount this evidence nor to delete these findings. However, the review department's decision is sound even assuming the validity of these findings. ■ While petitioner's rehabilitation is properly considered as a mitigating factor (*In re Dedman* (1976) 17 Cal.3d 229, 234 [130 Cal.Rptr. 504, 550 P.2d 1040]), the degree of discipline must correspond to some reasonable degree with the gravity of the misconduct. (*In re Nevill, supra,* 39 Cal.3d at p. 735.) And where an attorney's criminal act involves physical harm to another, the necessary showing of mitigating circumstances increases accordingly. (*Ibid.*)

■ A recent case which presents similar facts supports our conclusion that disbarment is appropriate. (*In re Nevill, supra,* 39 Cal.3d 729) In *Nevill,* the petitioner was convicted of voluntary manslaughter in the killing of his wife. The hearing panel considered as mitigating the facts that petitioner: 1) was having marital problems caused in part by his wife's involvement with another man; 2) used cocaine and alcohol on the day of the killing; 3) argued with his wife before killing her; 4) admitted his guilt immediately after the crime; 5) was diagnosed as having a personality disorder; and 6) was serving an eight-year sentence for the crime. The State Bar also considered the fact that petitioner had never before been disciplined, that he had been cooperative in the proceeding and that the killing was unrelated to the practice of law. (*Id.* at pp. 735-736.)

We rejected the State Bar's recommendation of suspension with probation, and disbarred the petitioner. We recognized that "it is our duty to protect the public from those attorneys who, for whatever reason, are unable to cope with pressure and adversity." (*Id.* at p. 735.) We found that the gravity of the crime and the need to protect the public and the profession outweighed the factors in mitigation. Many of the mitigating factors pre-

sented in *Nevill* parallel those presented in this case, and they are equally unavailing here.

We recognize that there are mitigating factors present in this case which did not apply in *Nevill*. Here, partly because of the protracted nature of the proceedings, petitioner has had more of an opportunity to demonstrate his capacity for rehabilitation. And his past community service, as well as his continued learning in the law, speak highly of his respect for the profession and of his intellectual capabilities. We do not minimize petitioner's rehabilitative efforts nor his demonstrated commitment to the practice of law. However, we cannot ignore the disastrous legacy of his severe emotional problems, and the extent to which they still affect his life.

We conclude that protection of the public, the courts and the profession is not adequately insured through probation. Thus, we adopt the review department's recommendation that petitioner be disbarred and that he bear the burden of proving by a sustained course of conduct his ability to practice law without supervision before being permitted to practice again. It is therefore ordered that petitioner's name be stricken from the roll of attorneys in this state, effective 30 days after the filing of this opinion.