[No. S013350. Mar. 14, 1991.]

In re RALPH J. LEARDO on Disbarment.

2

COUNSEL

George V. Denny III for Petitioner.

Quattrin, Johnson, Campora & England, David B. Johnson, Edwin T. Caldwell and Theodore A. Cohen as Amici Curiae on behalf of Petitioner.

Diane C. Yu, Richard J. Zanassi, Starr Babcock and Mara Mamet for Respondent.

OPINION

THE COURT.—We review the recommendation of the Review Department of the State Bar Court (hereafter review department) that petitioner be disbarred from the practice of law in California because of his 1985 conviction in the Virgin Islands on two counts of possessing controlled substances with intent to distribute (21 U.S.C. § 841(a)(1)). As will appear, we conclude that a less severe form of discipline will better recognize the compelling evidence of mitigation and rehabilitation in this record, will amply protect the public and the profession, and will promote consistency with a recent decision of this court on very similar facts (*In re Nadrich* (1988) 44 Cal.3d 271 [243 Cal.Rptr. 218, 747 P.2d 1146]).

In March 1986 petitioner voluntarily initiated these proceedings by informing the State Bar of his conviction in the Virgin Islands and asking that he be placed on interim suspension. Accordingly, we placed him on such suspension effective May 30, 1986, and referred the matter to the State Bar for a hearing and recommendation as to discipline.[1] During the years 1987 and 1988 petitioner and the State Bar entered into two successive stipulations as to facts and proposed disposition (Rules Proc. of State Bar, rules 401-407), but the review department summarily rejected both. On January 24, 1989, petitioner and the State Bar entered into a third "Stipulation as to Facts, Conclusions and Mitigation" (hereafter the stipulation). On the same day the matter was heard by the referee; testimony was given by petitioner, by his psychotherapist, and by a partner at the firm that employed him as a law clerk. The referee also accepted the stipulation, and incorporated by reference the stipulation and its exhibits into her formal decision filed with the State Bar Court on March 17, 1989.

In that decision the referee made various findings and conclusions as to the appropriate level of discipline, and recommended that petitioner be suspended for five years, that the order be stayed on condition that petitioner be actually suspended for two years, but that the actual suspension be retroactive to May 30, 1986, the date of our interim suspension.

By resolution filed September 12, 1989, the review department adopted the findings and conclusions of the referee, but rejected her proposed discipline. Instead, by a vote of seven to four the review department recommended that petitioner be disbarred.

I

The State Bar does not dispute the following facts taken from the decision of the referee, the stipulation and its exhibits, and the testimony at the hearing.

Before coming to California to study law petitioner lived in the Virgin Islands, where he worked as a legal assistant. He entered a California law school in 1978, and was admitted to the California bar in January 1981 at the age of 31. He practiced law in Los Angeles until February 1982, when he returned to the Virgin Islands. Later that year he was admitted to the Virgin Islands bar and opened a practice in St. Croix, and has not since practiced as a member of the California bar. He has had no prior discipline in this state.

---

[1] Petitioner and the State Bar stipulated that the case would be heard by a single referee sitting as a hearing panel (hereafter the referee).

In July 1980, while studying for the bar examination in California, petitioner was seriously injured in a motorcycle-automobile collision. His injuries included a comminuted fracture of the ankle and a broken leg; surgery was required, including the implantation of a steel rod in his leg. The surgery left petitioner in substantial pain, and his doctor administered morphine. Shortly before discharging him from hospital, his doctor began medicating petitioner's pain with the synthetic opiate Percodan. For the next year and a half petitioner continued to take Percodan under his doctor's prescriptions. Unfortunately, Percodan is addictive, and petitioner became dependent on the drug.

When petitioner returned to the Virgin Islands in early 1982, however, he was no longer able to obtain prescriptions for Percodan. He began to self-medicate with whatever drugs he could obtain, including heroin. He soon became addicted to heroin as well. At first he was able to pay for his drugs with the proceeds of his law practice; but as his addiction got worse his practice diminished, and after September 1984 he essentially stopped practicing.

In October and November 1984 a man who petitioner believed was a process server[2] approached petitioner and asked several times if petitioner could help him buy some cocaine. The man was actually an undercover narcotics agent. Petitioner refused, telling the agent that he did not want to sell drugs. By December 1984, however, petitioner's addiction had left him in serious physical and financial condition. The drugs he took made him sick, but he experienced withdrawal without them; he was virtually unable to function, and could not practice his profession; as a result he had no money and could not even pay his rent. At this point the undercover agent offered to lend him the rent money. When petitioner repaid the loan, the agent again asked petitioner to help him obtain drugs—but this time it was heroin, the drug to which petitioner was addicted. Rather than paying petitioner for the service, moreover, the agent offered to give petitioner money to buy heroin for him with the understanding that petitioner could keep a small portion of the drug for his own use. Petitioner accepted the offer because, as he testified, "I desperately needed the drugs."

Accordingly, in mid-December 1984 the agent gave petitioner $125 to buy six doses of heroin, agreeing that petitioner could keep one for his own use. About a week later the agent gave petitioner $1,200 for a larger amount of heroin, again agreeing that petitioner could keep a portion for himself. A third such arrangement was consummated for $1,600 later in December. In January 1985 petitioner encountered the agent in a bar and asked for a ride

---

[2] Petitioner had used the man's services as a process server on several occasions.

to get some drugs because he was going through withdrawal; the agent obliged, and gave petitioner $25 to buy him a dose as well.

By this time petitioner's addiction had progressed to the point at which he was also taking small amounts of cocaine with his heroin. The agent next came to petitioner's apartment, where petitioner had a small bag of cocaine he had bought for $40; at the agent's request, petitioner sold him the bag for $40. The final transaction occurred when the agent requested another $1,600 purchase of heroin on the same terms as before; but on February 27, 1985, when petitioner brought the drugs as agreed, he was placed under arrest.

Petitioner was charged in the Virgin Islands District Court with multiple counts arising from the foregoing events. In May 1985 he pleaded guilty to two counts based on the final transaction—possession of controlled substances (heroin and cocaine) with intent to distribute (21 U.S.C. § 841(a)(1))—and the remaining counts were dismissed. He was sentenced to the maximum term on each count (10 years) but the United States Parole Commission released him on parole after he had served only 16 months. (Former 18 U.S.C. § 4205(b)(2); see fn. 6, *post.*)

Petitioner testified that the time he spent incarcerated gave him the opportunity to detoxify his body, to reflect on what had gone wrong in his life, to realize that he had to take responsibility for his own actions, and to begin the process of his rehabilitation. While in prison he sought and received therapy and counseling for his addiction, and became a regular participant in the meetings of Alcoholics Anonymous (A.A.) and Narcotics Anonymous (N.A.) at the institution. He maintained an exemplary inmate record, and was highly regarded by prison staff.

Petitioner was released from custody in September 1986. He entered the drug after-care program administered by the federal parole authorities, and successfully completed its requirements of weekly individual counseling, attendance at N.A. meetings, and numerous random drug tests. Reviewing petitioner's participation in the program, United States Probation Officer Christensen reported that petitioner "has been very responsible in meeting his parole supervision responsibilities. He has taken full advantage of drug treatment services to assist him in abstaining from illegal drug usage."

Likewise, Senior United States Probation Officer Chavaria advised the State Bar that petitioner had consistently tested drug-free, is "actively involved in a program of recovery and abstinence," and fully understands the need for a lifelong commitment to abstinence and sobriety. Officer Chavaria concluded by stating that petitioner "is very serious about his recovery and

we would strongly urge that you give his request for re-admission to the State Bar favorable consideration."

Petitioner was scheduled to remain on parole until May 1998. Because of his success in the parole program, however, the United States Parole Commission granted him an early termination and discharged him from his primary parole term in January 1989. He continued on a special parole term as required by federal law, but even that parole was terminated early when the United States Parole Commission discharged him from all parole on June 14, 1990. In informing him of the discharge, his probation officer advised him that "Our records will reflect that your performance under parole supervision was outstanding."

It was stipulated that as of the date of the State Bar hearing petitioner had been drug-free since his arrest four years earlier. Although it was not a condition of probation, petitioner soon abstained from using alcohol as well. As he testified, he came to realize that he could not accept full responsibility for his actions unless he also stopped drinking. He therefore began attending regular meetings of A.A., and has not taken a drink since November 1986.

At the same time petitioner began individual psychotherapy with Dr. Rod Taylor, a specialist in treatment of chemical dependency of white-collar professionals to whom he had been referred by the United States Probation Department. After a year and a half of treatment Dr. Taylor reported in May 1988 that petitioner was highly motivated to rid himself of his drug dependency, had made a very successful therapeutic effort, and had gained a deep understanding of his former addiction. Dr. Taylor expressed the opinion that petitioner had made "remarkable progress," has "an excellent prognosis for recovery," and "should be allowed to return to a vocation he is trained for and capable of." Dr. Taylor concluded, "he has shown his remorse, has learned from his mistake and deserves to put this chapter of his life behind him. In my opinion, no therapeutic, social or ethical purpose could be served in preventing him from the practice of law."

Dr. Taylor also testified at the State Bar hearing nine months later. He had continued to treat petitioner on a weekly basis, and found no reason to depart from his former conclusions. On the contrary, he testified unequivocally that petitioner "continues to make significant personal growth" and has a strong psychological profile, and that his prognosis remains excellent. In particular, the doctor emphasized that petitioner has been drug-free for four years, which he explained is double the "benchmark" period of two years' abstinence used by behavioral professionals as a persuasive indicator

of recovery. Dr. Taylor gave his opinion that petitioner now "handles stress very well," and is fully capable of resuming his law practice.

Throughout this period petitioner has also been an active participant in The Other Bar, an organization of recovering lawyers and judges providing support to members of the legal profession with substance-abuse problems. He has served as an officer of that and similar organizations, and he spends a good deal of his time helping others to overcome problems with drugs and alcohol, as well as doing pro bono legal work. At the State Bar hearing petitioner submitted letters from at least six attorneys who knew petitioner through A.A., N.A., or The Other Bar, four attorneys for whom petitioner had worked as a law clerk, a law professor, and the Lieutenant Governor of the Virgin Islands, all of whom expressed confidence in his recovery and supported his reinstatement as a practicing attorney. Petitioner presently works as a law clerk for two San Francisco practitioners, who likewise strongly vouch for his recovery and his legal skills and urge his reinstatement.

The State Bar examiner stipulated to the following facts among others, denominated "mitigating circumstances":

"7. [Petitioner's] conduct did not harm any client, no client was affected, nor was [petitioner] involved in selling controlled substances to members of the general public.

"8. [Petitioner] did not profit financially from any of the transactions; his only gain was the retention of a small portion of each drug purchase for his own personal use and to support his addiction.

". . . . . . . . . . . . . . . . . . .

"21. [Petitioner] has been cooperative and candid with the State Bar in its investigation, both prior to his retention of counsel and thereafter. He has demonstrated remorse and contrition for his misconduct, and a desire to make amends."

In her decision the referee accepted the stipulation and incorporated its contents by reference "as binding findings of fact." On the basis of the stipulation, the exhibits attached thereto, and the testimony at the hearing, the referee concluded that "Clear and convincing evidence of mitigating circumstances are present in this case." The referee stressed that petitioner's criminal conduct had stemmed from his addiction; that he acknowledged his responsibility, first by pleading guilty, then by voluntarily bringing the matter to the attention of the State Bar; and that he has been cooperative

with the State Bar throughout, has taken affirmative steps to recover from his addiction, and has demonstrated remorse by both word and deed. The referee therefore concluded that "the record clearly supports a finding that significant mitigation exists in this case which outweighs the severity of the offense. [Petitioner] has been punished by his period of incarceration as well as his period of interim suspension. Accordingly, the discipline in this case [based on all the mitigating factors and actual punishment already imposed] should be less than what is routinely imposed in such cases." (Second brackets in original.)

As noted at the outset, the referee then recommended that petitioner be suspended for five years, that the order be stayed on condition that he be actually suspended for two years, but that the actual suspension be retroactive to May 30, 1986, the date that our interim suspension took effect. The referee explained that retroactive suspension "is warranted based on the extenuating factors of mitigation in this case and the fact that [petitioner] is not a threat to either the legal profession or the public. He has been free of alcohol and drugs for over three years. [Petitioner's] cooperation and efforts at recovery from his addiction problem need to be acknowledged." The referee also recommended a number of conditions of probation for the remainder of the five-year term.

The Office of Trial Counsel of the State Bar took the case to the review department. However, the Office of Trial Counsel did not dispute any of the facts or conclusions of the referee; indeed, it recited in its brief that "The Office of Trial Counsel readily concedes that there is a great deal of mitigation in this matter . . . . Consequently the Office of Trial Counsel has not sought the disbarment which Standard 3.2 ordinarily requires."[3] Rather, the Office of Trial Counsel simply asked the review department to change the recommended discipline so that the period of actual suspension would be reduced to one year but would be prospective rather than retroactive.

The review department, nevertheless, declined to follow either the recommendation of the referee or that of the Office of Trial Counsel. Instead, as noted above, by a vote of seven to four the review department recommended that petitioner be disbarred. Three of the four minority members would have adopted the recommendation of the referee, and the fourth would have imposed a one-year actual suspension only to be consistent with *In re Nadrich, supra,* 44 Cal.3d 271.

## II

The burden is on petitioner to show that the decision of the review department is erroneous or unlawful. (Bus. & Prof. Code, § 6083, subd. (c).)

---

[3] We discuss this "standard" below. (Fn. 8, *post.*)

Here petitioner undertakes to show that the discipline recommended by the State Bar is excessive in light of the record and our prior cases. ■ While we give great weight to the review department's recommendation, we exercise our independent judgment in determining the proper discipline to impose. (*In re Nadrich, supra,* 44 Cal.3d 271, 275, and cases cited.) "This is particularly appropriate when, as here, the review department and the hearing panel disagreed, and the review board itself was closely divided." (*Id.* at pp. 275-276.)

■ The offenses of which petitioner was convicted involve moral turpitude; petitioner also stipulated that he violated his oath and duties as an attorney. His misconduct was no doubt serious, and warrants disbarment in the absence of compelling mitigating circumstances. (Bus. & Prof. Code, § 6101, subd. (a); see, e.g., *In re Possino* (1984) 37 Cal.3d 163 [207 Cal.Rptr. 543, 689 P.2d 115] [disbarment after conviction of offer to sell 350 pounds of marijuana]; *In re Giddens* (1981) 30 Cal.3d 110 [177 Cal.Rptr. 673, 635 P.2d 166] [disbarment after federal conviction of conspiring to sell large quantities of amphetamines].) ■ Nevertheless, "when we impose discipline we must seek, not to punish the attorney, but to protect the public, the profession, and the courts." (*Rodgers* v. *State Bar* (1989) 48 Cal.3d 300, 318 [256 Cal.Rptr. 381, 768 P.2d 1058].) ■ Our task is therefore to view petitioner's conduct in light of the mitigating or aggravating circumstances in the record, and on that basis to determine the degree of discipline that is both necessary and sufficient to serve the purposes of this proceeding.

■ The facts set forth in part I of this opinion make a compelling showing of both mitigation and rehabilitation. To summarize the evidence in mitigation, petitioner initially became addicted to opiates as a result of legitimate medical treatment; when that treatment terminated he turned to illicit drugs for the purpose of relieving his addiction; and he agreed to sell such drugs only after his withdrawal from practice had deprived him of the means of obtaining the narcotics he depended upon. Petitioner did not profit financially from any of the transactions, retaining only a small portion of the drugs purchased on each occasion for his personal need. The idea of making these transactions originated with the undercover agent for whom he obtained them, and much of petitioner's participation therein came at the repeated urging of that agent. None of petitioner's sales were to anyone other than the agent: petitioner sold no drugs to the public, and hence put no illicit drugs in circulation and caused no physical or financial harm to any person. In particular, petitioner's offenses were not related in any way to his former practice of law, and did not injure or otherwise affect the interests of any client.

Petitioner's rehabilitation began promptly upon his incarceration. The experience taught him that he had to take responsibility for his own actions.

He voluntarily sought and received therapy and counseling for his addiction, and became a regular participant in A.A. and N.A.

Since his release petitioner has vigorously pursued his goal of full recovery. He successfully completed the federal drug after-care program, then engaged in a long period of private psychotherapy and counseling. He has been drug-free since February 1985, and has not taken a drink since November 1986. Throughout this period he has been active in N.A., A.A., and The Other Bar, and has spent much time helping others to overcome their substance abuse problems. Both his federal probation supervisor and his psychotherapist recommend that he be allowed to resume his practice at this time. He has been working full-time as a law clerk for two practitioners who vouch for his legal skills and ability to handle the stress of practice. Finally, petitioner has consistently admitted the wrongfulness of his acts and expressed deep remorse. He voluntarily initiated these proceedings against him, and has fully cooperated with the State Bar throughout the long period of investigation and negotiation leading to the stipulation he entered into with the Office of Trial Counsel.

On this record we are persuaded that the protection of the public, the courts, and the profession does not require the extreme sanction of disbarring this petitioner. We so held in *In re Nadrich, supra,* 44 Cal.3d 271 (hereafter *Nadrich*), on remarkably similar facts. There, too, the petitioner became addicted to opiates prescribed by his doctors as painkillers after an automobile accident; when his source of lawful drugs was terminated, Nadrich began using illegal drugs, including heroin and opium, to satisfy his addiction; he stopped practicing law, endured physical and financial hardship, and began selling drugs to support his habit. One of his customers was a government informant; Nadrich was arrested and pleaded guilty to federal charges of possession of a controlled substance with intent to distribute it, and of using interstate commerce to distribute such substance. He was sentenced to a term of seven years, but was paroled after three years in prison and four months in a halfway house.

While imprisoned, Nadrich began his rehabilitation by undergoing psychological therapy and becoming active in A.A. and N.A. After his release he continued to work intensively with those and similar organizations, to receive individual psychotherapy, and to help others with drug and alcohol problems. His therapist reported that his prognosis was excellent, and a number of individuals, including members of the bar, wrote letters or testified in his support. He remained drug-free during the two years between his release and our decision. And throughout the disciplinary proceedings he expressed remorse and cooperated fully with the investigation.

As in the present case, the hearing panel recommended only that Nadrich be suspended from practice, but by a divided vote the review department recommended disbarment. We rejected the department's recommendation. After reviewing Nadrich's impressive evidence of mitigating circumstances and recovery efforts, we reasoned: "In sum, he has 'earnestly and successfully engaged in a strenuous rehabilitative effort which, in fairness to petitioner, we cannot ignore.' [Citation.] Indeed, it is difficult to imagine what more petitioner could have done to demonstrate the sincerity of his commitment to positive change and rehabilitation. . . . [¶] Viewing petitioner's wrongful conduct in light of both the circumstances surrounding that conduct and petitioner's demonstrated rehabilitation, we conclude the protection of the public, the courts, and the legal profession does not require disbarment. A lesser degree of discipline, specified below, will be sufficient to insure that petitioner's complete rehabilitation is very well established before he escapes the properly watchful eye of the State Bar." (*Nadrich, supra,* 44 Cal.3d at pp. 277, 278-279, fn. omitted.) We therefore ordered Nadrich suspended for five years, including one year on actual suspension and four years on strict probation.

Justice Eagleson, in a concurring opinion joined by Justices Arguelles and Kaufman, likewise emphasized the mitigating factors leading to Nadrich's offenses and his showing of rehabilitation: "Most telling, of course, is the overwhelming evidence of rehabilitation. Since the inception of his incarceration, petitioner has consistently acknowledged responsibility for his crimes, and has diligently sought to permanently rid himself of his addiction. He has actively and selflessly participated in various recovery programs, including those specifically designed to help solve the drug and alcohol problems of other members of the legal profession. Finally, petitioner's abstention from drug use is well documented, his therapeutic prognosis is excellent, and his desire to contribute to the legal profession is strong." (44 Cal.3d at p. 281.) All the foregoing is true in the present case as well.[4]

The case at bar closely resembles *Nadrich* in yet another way. In that case (44 Cal.3d at pp. 277-278) we noted that the review department's sole stated reason for recommending disbarment was that Nadrich "was a professional dealer in illegal drugs for a substantial period of time and did not cease to be

---

[4]For other cases in which an attorney was not disbarred although he had been convicted of a narcotics crime involving moral turpitude, see *In re Fudge* (1989) 49 Cal.3d 643 [262 Cal.Rptr. 385, 778 P.2d 1113] (furnishing marijuana and methaqualone to a minor), *In re Kreamer* (1975) 14 Cal.3d 524 [121 Cal.Rptr. 600, 535 P.2d 728] (possession of 791 pounds of marijuana with intent to distribute), *In re Cohen* (1974) 11 Cal.3d 416 [113 Cal.Rptr. 485, 521 P.2d 477] (possession for sale of 34,000 grams of marijuana), and *In re Higbie* (1972) 6 Cal.3d 562 [99 Cal.Rptr. 865, 493 P.2d 97] (federal conviction of failure to pay marijuana "transfer tax"—actually, conspiracy to smuggle a large amount of marijuana into the United States).

so until arrested. A lawyer who engages in such conduct should be disbarred." We responded, "This statement betrays an oversimplified and unsupported view of the law." (*Id.* at p. 278.) We rejected the statement because it implied, incorrectly, that we discipline attorneys simply to punish them, that in cases of serious offenses we will not consider substantial mitigating evidence, and that we apply rigid disciplinary standards without regard to the facts of each case. We concluded (*ibid.*) that "As a reason for recommending disbarment, in short, the review department's statement is simply not good enough."

Here, too, the review department gave a single reason for recommending disbarment, and it is also "not good enough." The review department unanimously adopted the findings and conclusions of the referee as its own, and made an additional finding that "[petitioner] used heroin prior to his motorcycle accident." The majority members of the review department (hereafter the majority) then took that additional finding, expanded it into a much broader statement of asserted fact, and on that basis sought to distinguish *Nadrich* and justify their recommendation that petitioner be disbarred. As will appear, however, the entire structure collapses because the majority's statement of asserted fact is unsupported by the evidence.

The majority reasoned that (1) "[petitioner] had used unlawful drugs, including but not limited to heroin, well before the motorcycle accident which he had claimed had caused his addiction to heroin and cocaine"; (2) "he admitted that the motorcycle accident had served as an excuse for his illegal use, addiction and sale of narcotics"; and therefore (3) "[petitioner] is not an individual who had involved himself in illegal drugs from the effects of pain and suffering experienced from the motorcycle accident." The conclusion does not follow, however, because the majority's second premise is incorrect.

To begin with, it is true that petitioner had "used" unlawful drugs before his accident, but not in the sense that the majority imply, i.e., as a regular or steady user. The sole evidence on this point was petitioner's candid testimony on direct examination at the hearing before the referee. Petitioner's counsel asked him whether he had used heroin before his accident, and he replied, "Yes. I mean, I had tried it. I had not been a regular user of it." On cross-examination counsel for the State Bar asked petitioner whether his earlier drug use was "an experimenting in college type of thing?" Petitioner acknowledged that he had "experimented" with drugs "for the effect" before his accident, but explained that alcoholic beverages had been enough for him "until this point in 1982," i.e., when he moved to the Virgin Islands after his accident and was cut off from the medically prescribed Percodan on which he had become dependent. To disbar petitioner simply because he

had "experimented" with drugs before his accident—despite his compelling showing of rehabilitation since that time—would be to revive the rigid and oversimplified attitude towards discipline that we condemned in *Nadrich* (44 Cal.3d at pp. 277-278).

Second, the finding of the majority that petitioner "admitted that the motorcycle accident had served as an excuse for his illegal use, addiction and sale of narcotics" is simply a distortion of the record. The only evidence on this point was an answer by petitioner on direct examination. After inquiring about petitioner's injuries and the pain they had caused him at the time of the accident, his counsel asked, "Does there continue to be any pain associated with these injuries?" Petitioner replied that there is, but that he now puts up with the pain rather than turning to drugs for relief, as he did before he was rehabilitated.[5]

The majority change the meaning of this simple and direct answer by taking it out of context. In his testimony immediately preceding this collo-quy petitioner explained that his doctors prescribed morphine and Perco-dan for the pain of his injuries, and that "the pain was substantial, and I felt I needed the narcotics to deal with the pain." In that context, petitioner's ensuing reference to "the drugs" can fairly be read only to mean the *pre-scribed* drugs; and his remark, "once I got used to the drugs," must likewise be taken to refer to his medically induced addiction. Thus read, his answer is certainly not "admission" that he became addicted *before* his accident, as the majority erroneously imply. Indeed, such a suggestion is wholly at odds with all the rest of the testimony at the hearing and with the stipulation entered into by the State Bar and adopted by both the referee and the review department itself. That testimony and stipulation establish that petitioner's addiction was medically induced after his accident. It follows that *Nadrich* cannot fairly be distinguished on this ground.

### III

The State Bar presents only two contentions in its brief, and neither is persuasive. First, the State Bar argues that petitioner's offenses were so grave that disbarment is necessary to preserve public confidence in the legal profession "even with due consideration to the factors presented in mitiga-

---

[5] His answer, in its entirety, reads as follows:

"There is some discomfort, but my whole attitude towards pain is different now. I mean, the way I used to be, if I was uncomfortable about anything, I would seek relief from alcohol and then from the drugs.

"And once I got used to the drugs, that was the easiest escape there was. And physical pain was a perfect excuse to use drugs. And now I have a different attitude about pain.

"Pain is just something that we all have to go through. And I don't feel that normal aches and pains now deserve medication, or anything similar to what I used to take for [pain]."

tion." To begin with, the claim is contradicted by the State Bar's own findings in this case. As noted above, the referee recited in her decision that "the record clearly supports a finding that significant mitigation exists in this case *which outweighs the severity of the offense.*" (Italics added.) In turn, the review department unanimously adopted the findings and conclusions of the referee—including therefore the quoted finding—"as the findings of fact and conclusions of the Review Department . . . ." The State Bar fails to show that the quoted finding is unsupported by the record.

Nor do the published decisions support the State Bar's contention. In the case most closely in point—*Nadrich*—we held that because of a strong showing of mitigation and rehabilitation, "the protection of the public, the courts, and the legal profession does *not* require disbarment." (*Nadrich, supra,* 44 Cal.3d at p. 279, italics added.) It is significant that in its brief the State Bar cites but does not discuss *Nadrich,* less still attempt to distinguish it. Instead, the State Bar relies on three cases that arose on facts wholly different from those of the case at bar, and hence that warranted a different discipline.

In the first case relied on by the State Bar, *In re Demergian* (1989) 48 Cal.3d 284 [256 Cal.Rptr. 392, 768 P.2d 1069], we disbarred an attorney who wilfully misappropriated over $25,000 from a client's trust fund in order to buy illegal drugs, then attempted to conceal his wrongdoing by deceiving the court and another attorney. We distinguished the case from *Nadrich,* stressing that Demergian's addiction resulted from voluntary abuse of illegal drugs rather than prescribed use of legal medication, and that he had not first withdrawn from the practice of law—on the contrary, he stole his drug money from an active client trust fund. (*Id.* at p. 298.)

Equally distinguishable is *In re Strick* (1987) 43 Cal.3d 644 [238 Cal.Rptr. 397, 738 P.2d 743], in which we disbarred an attorney who fired his gun several times at his roommate and her boyfriend, killing the latter, then callously mistreated the body and attempted to implicate the surviving victim in the shooting. He was convicted of voluntary manslaughter and assault with a deadly weapon. The hearing panel found that Strick's acts arose from personality defects that had led him to use illegal drugs, and that he " 'is not presently capable of the practice of law without supervision.' " (*Id.* at p. 651.) The review department adopted those findings, and added a finding that Strick "requires continued psychiatric care for a severe depressive and obsessive state." (*Id.* at p. 652.) We explained that "the degree of discipline must correspond to some reasonable degree with the gravity of the misconduct," and "where an attorney's criminal act involves physical harm to another, the necessary showing of mitigating circumstances increases accordingly." (*Id.* at p. 656.) We therefore ordered Strick disbarred

because of "the gravity of his crimes and his present inability to practice law without supervision . . . ." (*Id.* at p. 654.) Here, by contrast, petitioner harmed no one and his ability to practice without supervision is undisputed.

Finally, the State Bar cites *In re Giddens, supra,* 30 Cal.3d 110, but it too is not in point. We there disbarred an attorney who had been convicted of conspiring to sell, for profit, large quantities of amphetamines. We stressed that Giddens "suffered neither from financial hardship, drug addiction, alcohol dependency, nor emotional distress" when he committed his crimes, and that he offered no explanation for his conduct. (*Id.* at p. 115.) Again the contrast with the record of the case at bar could not be more plain.[6]

The second contention of the State Bar is that disbarment is appropriate because if petitioner were to apply for reinstatement after disbarment the question of his conduct and rehabilitation would be thoroughly examined as part of the reinstatement process. We rejected an identical contention in *Nadrich, supra,* 44 Cal.3d at page 278. There, as here, the petitioner would have been eligible to apply for reinstatement soon after disbarment. We reasoned (*ibid.*) that "It is difficult to see how petitioner's case would be made more persuasive by the passage of limited additional days of noncustodial time, or how a thorough examination of his conduct and rehabilitation at that time would be any more enlightening than the thorough examination taking place here and now. Indeed, protection of the public would be better served by supervision of the petitioner over a period of several years on probation."

In the case at bar petitioner would be eligible to apply for reinstatement as early as May 1991. (Rules Proc. of State Bar, rule 662.) "Assuming his application—which would undoubtedly document his impressive rehabilitative effort—is granted, he would soon reenter the profession and be free of all probationary supervision." (*Nadrich, supra,* 44 Cal.3d at p. 281 [conc. opn. of Eagleson, J.].) Moreover, as in *Nadrich,* petitioner's fitness to practice law has been thoroughly examined and reexamined in the present proceeding. An evidentiary hearing has been held, the State Bar has stipulated to many of the facts demonstrating mitigating circumstances and rehabilitation, and both the referee and the review department have an-

---

[6]The State Bar seeks to magnify the seriousness of petitioner's offenses by stressing that he was given a 10-year concurrent sentence on each count. The effort misses the mark. The offenses to which petitioner pleaded guilty (21 U.S.C. § 841(a)(1)) apparently carried a maximum sentence of 10 years each, with parole eligibility after one-third of that term (former 18 U.S.C. § 4205(a)). But petitioner was in fact sentenced pursuant to a special statute. (Former 18 U.S.C. § 4205(b)(2).) Under that provision, the court merely set the sentence at maximum and the United States Parole Commission determined the actual term to be served by releasing the defendant when it found it appropriate to do so. As noted above, here that commission released petitioner after he had served only 16 months.

nounced their findings and conclusions. No purpose would be served by requiring those same facts to be litigated again in another proceeding.

For all the foregoing reasons we conclude that disbarment is not the appropriate discipline in this case.

IV

The remaining issue, therefore, is what is the proper discipline here. We have no doubt that a lengthy period of close supervision on probation is warranted to ensure that petitioner's rehabilitative effort, so impressively begun and sustained for more than four years, continues to a successful conclusion. For that purpose, we agree with the referee's recommendation that petitioner be suspended from the practice of law for five years, and that execution of the order of suspension be stayed on stringent conditions of probation.

The next question is whether a period of actual suspension is also required. "Although a period of actual suspension would ordinarily be warranted when moral turpitude has been found, we are persuaded that there are compelling circumstances here which justify an exception." (*In re Chira* (1986) 42 Cal.3d 904, 909 [231 Cal.Rptr. 560, 727 P.2d 753] [federal conviction of conspiracy to impede the function of the Internal Revenue Service by participating in a fraudulent tax-shelter scheme; no actual suspension].)

It is true that we ordered an actual suspension of one year in *Nadrich*. But as three minority members of the review department correctly observed, certain differences between *Nadrich* and this case support the conclusion that a different and lesser discipline is appropriate here. Nadrich became a large-scale drug dealer to support his habit. He was convicted of possession for sale of approximately 120,000 dosage units of LSD with a value of $60,000, and of the interstate transportation of those drugs—from California to New Jersey—to sell them. If his scheme had succeeded he would have made a cash profit of $6,000. That conduct, moreover, was part of a larger practice whereby he acquired and sold substantial quantities of illegal drugs, including heroin, cocaine, and LSD, for financial gain. He admitted engaging in at least eight such transactions over a two-year period. (*Nadrich, supra*, 44 Cal.3d at pp. 274, 281-282.) In contrast, the petitioner now before us furnished relatively small quantities of drugs, over a period of only a few months, to a single "buyer" who was in fact an undercover agent and had himself proposed and urged the transactions. Petitioner did not profit financially from any of the sales, but kept only a small portion of each delivery for his personal needs. It appears, therefore, that petitioner's culpability was measurably less than that of Nadrich. We agree with the referee

that an exception to the rule of actual suspension is warranted here because of the "extenuating factors of mitigation in this case and the fact that [petitioner] is not a threat to either the legal profession or the public."

Second, at the time of our decision Nadrich had spent only two and one-half years on interim suspension after his release from custody, while petitioner herein has already spent two years more than Nadrich in that status. We believe it appropriate to give weight to the length of time that petitioner has been suspended. Although this is the type of case in which we would normally impose a substantial period of actual suspension, we decline to do so because petitioner has already served four and one-half years on noncustodial interim suspension.[7] Whether a suspension be called interim or actual, of course, the effect on the attorney is the same—he is denied the right to practice his profession for the duration of the suspension.

■ ■ ■ ■ We conclude that under the unusual facts and circumstances of this case a further period of suspension is not required for the protection of the public, the profession, or the courts.[8] Instead, the discipline hereafter ordered will fully serve the proper purposes of this proceeding.[9]

It is ordered that petitioner Ralph John Leardo be suspended from the practice of law for five years. Execution of this order of suspension is stayed and petitioner is placed on probation for five years, during which period he may engage in the practice of law. Petitioner shall take and pass the Profes-

---

[7] In addition, petitioner was suspended from practice in the Virgin Islands from May 30, 1985, to May 30, 1990.

[8] We recognize that standard 3.2 of the State Bar Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V) provides that discipline for conviction of a crime involving moral turpitude shall be disbarment unless compelling mitigating circumstances clearly predominate; and in the latter event, discipline shall not be less than a two-year actual suspension prospective to any interim suspension, "irrespective of mitigating circumstances." Those standards, however, "are simply guidelines for use by the State Bar. Whether the recommended discipline is appropriate is still a matter for our independent review." (*Boehme* v. *State Bar* (1988) 47 Cal.3d 448, 454 [253 Cal.Rptr. 245, 763 P.2d 1335]; *Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754].) For the reasons stated herein, neither the discipline recommended by the review department nor the minimum discipline provided in standard 3.2 is appropriate. We note that the Office of Trial Counsel itself did not feel bound by the letter of this standard, because it recommended an actual suspension of one year rather than two.

[9] Petitioner has appended to his brief a request to augment the record to include certain documents bearing on the procedural history of this case while it was pending in the State Bar. Because these documents are not material to our reasoning herein, the request is denied.

Petitioner has also filed a request to take judicial notice of the transcript of a recent hearing in the District Court of the Virgin Islands on his pending petition for reinstatement to the bar of the court. Because the testimony reported in that transcript is largely cumulative of the evidence in the record before us, the request is denied.

sional Responsibility Examination during the first year of his probation. His probation is subject to the following conditions:

1. He shall comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California.

2. He shall report not later than January 10, April 10, July 10 and October 10 of each year or part thereof during which the probation is in effect, in writing, to the Office of the Clerk, State Bar Court, Los Angeles (provided, however, that if the effective date of probation is less than 30 days preceding any of said due dates, he shall file his first report not later than the second such due date following the effective date of probation). Each such report shall state that it covers the preceding calendar quarter or applicable portion thereof, verifying by affidavit or under penalty of perjury:

(a) in his first report, that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct since the effective date of said probation; (b) in each subsequent report, that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct during said period; (c) and he shall file a final report, covering the period of probation remaining after the last quarterly report required by this condition of probation, certifying that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct during said period.

3. He shall be referred to the Department of Probation, State Bar Court, for assignment of a probation monitor referee. Petitioner shall promptly review the conditions of his probation with the probation monitor referee to establish a manner and schedule of compliance consistent with these terms of probation. He shall furnish such reports concerning his compliance as the probation monitor referee may request. He shall cooperate fully with the probation monitor referee to enable the latter to discharge his duties pursuant to rule 611 of the Rules of Procedure of the State Bar.

4. He shall abstain from the use of any controlled substances other than those prescribed for him by a physician, and shall certify that he has done so in any report he is required to make under these conditions of probation.

5. He shall participate in the substance-abuse program of the State Bar in the discretion of his probation monitor referee.

6. He shall maintain on the official membership records of the State Bar, as required by Business and Professions Code section 6002.1, his current office or other address for State Bar purposes and all other information required by that section. He shall report to the membership records office of

the State Bar all changes of information as prescribed by said section 6002.1.

7. Except to the extent prohibited by the attorney-client privilege or the privilege against self-incrimination, petitioner shall answer fully, promptly and truthfully to the Presiding Referee of the State Bar Court, or the referee's designee or any probation monitor referee assigned under these conditions of probation, at petitioner's office or an office of the State Bar (or another place agreed upon by petitioner and the Presiding Referee, designee or probation monitor referee), any inquiry or inquiries directed to him personally or in writing by said Presiding Referee, designee, or probation monitor referee relating to whether petitioner is complying or has complied with these terms of probation.

8. The period of probation shall begin on the date on which this decision becomes final.

9. If petitioner complies with each of the foregoing conditions his probation shall terminate without further order of this court at the expiration of the probationary period.

This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 953(a).)